[No. 30446. *En Banc.* August 20, 1948.]

HARVEY L. CREASMAN, *Appellant,* v. JOHN M. BOYLE, *as Administrator, et al., Respondents and Cross-appellants.*[1]

[1] Reported in 196 P. (2d) 835.

*Ralph Purvis,* for appellant.

*John M. Boyle* and *Mervyn F. Bell,* for respondents and cross-appellants.

STEINERT, J.—Plaintiff brought action asking that he be adjudged the owner and entitled to the possession of certain real and personal property, the title to most of which was then standing in the name of a deceased person; that the defendant, administrator of the deceased person's estate, be decreed to be the holder of this property in trust for the plaintiff; and that defendant be required to execute and deliver to plaintiff proper conveyances and transfers of title to the property. Defendant and two additional, intervening defendants, heirs of the deceased person, answered by denying the material allegations of the complaint, and asked that plaintiff's action be dismissed.

Upon a trial by the court, without a jury, findings of fact and conclusions of law were made, upon which the trial court

entered judgment awarding an undivided one-half interest in the property to the plaintiff and a like one-half interest to the defendant administrator.. From that judgment, each and all of the parties have appealed. We shall hereinafter refer to the plaintiff as appellant, and to the defendant and additional defendants as respondents.

The facts of the case are as follows: Appellant, Harvey L. Creasman, is a negro and, since 1923, has been a resident of Kitsap county, Washington. Caroline A. Paul, now deceased, was a white woman who, prior to 1937, lived in Des Moines, Iowa; in 1929, she was divorced from her husband, in that state. The respondents Emma Middleton and Clarence Paul, both of whom are married, are the children of Caroline Paul and the husband to whom reference has just been made. Emma Middleton, the daughter, lives in Seattle, and has three children, the oldest of whom is seventeen years of age.

Caroline A. Paul moved to Seattle in 1937, shortly after her daughter and family had located in that city. Sometime after her arrival in Seattle, Mrs. Paul procured employment as a waitress in a cafe which was patronized by both colored and white people. About that same time, she met and became acquainted with appellant. Her early acquaintance with him was described by appellant in his testimony, as follows:

"Q. And when did you first meet Caroline A. Paul? A. I think it was 1937. Q. And where did you meet her? A. In Seattle. Q. And where was it you met her? A. Met her at Father Divine's Church. Q. Is that a church for colored people? A. Anybody. Q. Did you see her very often after you met her in 1937? A. No, because she got married to my friend."

The record does not explicitly show but does indicate that, sometime between 1937 and 1939, Caroline A. Paul procured a divorce from one Henry C. Reynolds, in Seattle.

In the month of February, 1939, Mrs Paul went to live with appellant, Harvey L. Creasman, in Bremerton, where appellant was employed in work involving the demolition of automobiles. They rented a house from appellant's employer

and began living together therein as husband and wife, under the name of Creasman. At the time of entering into this liaison, the only property which Mrs. Paul owned or possessed was a 1933 Plymouth sedan, a small amount of jewelry, and $3.80 in cash; the only property which appellant owned was a Plymouth coupe, valued at $90.

On or about October 23, 1939, Mrs. Paul, using her true name, Caroline A. Paul, but while living with appellant under the name of Creasman, entered into a real-estate contract with Mattie A. Joslin, by the terms of which Miss Joslin agreed to sell, and Mrs. Paul agreed to buy, the parcel of real estate involved in the present action. This property consisted of four lots in Navy Yard Addition to Sidney, in Kitsap county, upon which was a dilapidated, one-room "shack," with a shed attached. The purchase price was $875, of which $90 was paid by turning appellant's Plymouth coupe in on the contract, and the balance of $785 was to be paid in monthly installments of $12 each, with interest at the rate of six per cent per annum.

After negotiating this purchase, appellant and Mrs. Paul moved upon these premises and from that time forward lived thereon together as husband and wife, holding themselves out in the community as such, under the name of Creasman.

In April, 1940, appellant went to work in the Bremerton navy yard and was employed there until April, 1946. His total net earnings during that six-year period amounted to $13,435.30, plus $1,256.25 which was deducted from his pay in periodic installments for the purchase of war bonds. Nine of these bonds listed Caroline A. Creasman as beneficiary, and the rest listed her as co-owner. The amount so earned during the entire period of six years averaged about $2,450 a year, or $204 a month.

In July, 1942, Mattie A. Joslin, mentioned above, executed and delivered to Caroline A. Paul a deed to the real property here involved, upon which appellant and Mrs. Paul were then residing. The evidence in the case sustains the finding of the trial court that all of the payments for this real property were made with moneys earned by the appellant while

he and Mrs. Paul were living together as husband and wife. The payments were actually made, however, by Mrs. Paul.

Sometime after the purchase of this real property on contract and after the parties had moved thereon, appellant by his own personal labor, and with materials purchased by him and paid for out of his earnings, built two additional rooms onto the house and otherwise improved the property.

During the six years these parties lived together as above described, they also purchased for use in the home considerable furniture, furnishings, and household equipment. These purchases were made in the name, or charged to the account, of appellant and were likewise paid for out of his earnings, although Mrs. Paul usually made the actual payments.

It appears from the evidence that during the years 1945 and 1946, Mrs. Paul carried a checking account, averaging about $150, in the Kitsap County Bank, under the name of Mrs. Caroline A. Creasman. In this account she deposited a number of appellant's government checks issued in payment of his wages. It further appears that, during the years 1945 and 1946, Mrs. Paul cashed all of the war bonds which had been previously purchased with appellant's earnings and in which she was named either as beneficiary or as co-owner. The proceeds of these bonds she deposited in a United States postal savings account under the name of Caroline A. Creasman. This account now shows a balance of $1,712, represented by postal savings certificates.

The relations and mode of living established between appellant and Mrs. Paul, as heretofore described, continued unbrokenly for a period of seven years, until terminated by the death of Mrs. Paul in October, 1946. Shortly after her death, appellant petitioned for letters of administration of the estate of Caroline Creasman, otherwise known as Caroline Paul. His petition alleged that he was the surviving spouse of the deceased, and that she left an estate consisting of real property valued at $3,500, and personal property of the probable value of $500. Appellant was appointed administrator, qualified as such, and acted in that capacity until his removal from office in March, 1947, presumably upon

the petition of Emma Middleton and on a showing that appellant was not the husband of the deceased, Caroline A. Paul. Respondent John M. Boyle was thereupon appointed administrator in appellant's stead. Respondent Boyle thereafter filed an inventory and appraisement listing and valuing the property in the estate as follows: real property, above described, $3,000; household goods, furniture, and effects, $1,000; postal savings account, $1,712; Plymouth sedan, which Mrs. Paul owned prior to living with appellant, $60; sundries, consisting mostly of items of jewelry, $117; total, $5,889.

After his removal as administrator, appellant instituted this action, praying that he be adjudged the owner and entitled to the possession of all of the property listed in the inventory, except the automobile and jewelry.

In his analysis of the evidence, the trial judge stated that while the parties were not legally husband and wife, they nevertheless lived together as such and were so regarded by all of their friends; that she performed all the duties of a housewife and, besides, attended to all the business affairs, which he left entirely to her management; and that by her thrift the parties were able to accumulate a fairly substantial estate. The substance of the court's statements is contained in the following paragraph:

"It is clear and convincing that he [appellant] did furnish all or practically all of the money. It is likewise clear and convincing that she [Mrs. Paul] furnished contributions to the venture in her thrift, in her housekeeping, and all of the acts that an ordinary housewife does, that is equivalent in value to the money that he furnished."

Subsequently, the court made formal findings of fact to the effect that all of the property above described, except the jewelry and Plymouth sedan, had been purchased or acquired with money of the appellant, but that Mrs. Paul had contributed materially, though not financially, to the accumulation of all of that property. The evidence supports the statements and the findings made by the court. Pursuant to its findings, the trial court entered judgment awarding to appellant a one-half interest in the property claimed by

him, and to the respondent administrator the other one-half interest therein. As stated above, all of the parties herein have appealed from that decree.

■ Appellant has moved in this court that the appeal of the respondents be dismissed for the reason that respondents' transcript and brief were not timely filed under the rules relating thereto.

Those matters are not jurisdictional, and appellant has in no way been prejudiced by the alleged delay in filing. The motion is denied.

On the merits of the case, as presented by the facts herein, the question is this: Where a man and a woman are not married to each other, but deliberately agree to, and do, live together as husband and wife, holding themselves out to the world as such, and performing the duties normally required of, and performed by, a husband and wife, respectively, and where, during the period of such illicit cohabitation, such persons acquire real and personal property, the purchase price for all of which is furnished by the man through his current earnings, and title to the real property is voluntarily placed or taken in the name of the woman, and a part of the personal property is allowed to, and does, stand in the name, or assumed name, of the woman, and the remainder of the personal property was, at the time of its purchase, charged by the sellers to the account of the man, although there was no bill of sale or other writing evidencing title thereto, and that property is thereafter used by the man and the woman jointly—under such circumstances, to whom do such properties, respectively, legally and equitably belong?

■ It has been declared to be a rule of law in this state that property acquired by a man and a woman not married to each other, but living together as husband and wife, is not community property, and, *in the absence of some trust relation,* belongs to the one in whose name the legal title to the property stands. *Engstrom v. Peterson,* 107 Wash. 523, 182 Pac. 623; *Hynes v. Hynes,* 28 Wn. (2d) 660, 184 P. (2d) 68. In connection with these two cases see, also, *Stans v. Baitey,* 9 Wash. 115, 37 Pac. 316; *In re Sloan's Estate,* 50 Wash. 86, 96 Pac. 684, 17 L. R. A. (N.S.) 960; *Beyerle v. Bartsch,* 111

Wash. 287, 190 Pac. 239; *Carr v. Bell*, 129 Wash. 413, 225 Pac. 230.

The reason why property acquired in such manner is held not to be community property is simply because, as stated in the *Sloan* case, *supra,* if there has been no lawful marriage between the parties concerned, there can be, as to them, no community property.

■ However, even though there be no lawful marriage between such parties, yet if either or both of them in good faith enter into a marriage with the other, or with each other, and such marriage proves to be void, a court of equity will protect the rights of the innocent party in the property accumulated by the joint efforts of both. *Buckley v. Buckley,* 50 Wash. 213, 96 Pac. 1079, 126 Am. St. 900; *In re Brenchley's Estate,* 96 Wash. 223, 164 Pac. 913, L. R. A. 1917E, 968; *Knoll v. Knoll,* 104 Wash. 110, 176 Pac. 22, 11 A. L. R. 1391; *Powers v. Powers,* 117 Wash. 248, 200 Pac. 1080. For cases from other jurisdictions, see Notes (1931) 75 A. L. R. 732.

In the *Buckley* case, *supra,* this court said:

"Where a woman in good faith enters into a marriage contract with a man, and they assume and enter into the marriage state pursuant to any ceremony or agreement recognized by the law of the place, which marriage would be legal except for the incompetency of the man, which he conceals from the woman, a status is created which will justify a court in rendering a decree of annulment of the attempted and assumed marriage contract, upon complaint of the innocent party; and where in such a case the facts are as they have been found here, where the woman helped to acquire and very materially to save the property, the court has jurisdiction as between the parties, to dispose of their property as it would do under Bal. Code, § 5723, [Rem. Rev. Stat., § 989], (P.C. § 4637), in a case of granting a divorce— awarding to the innocent, injured woman such proportion of the property as, under all the circumstances, would be just and equitable."

We cite these last-mentioned cases and quote from the *Buckley* case, *supra,* not because they have any controlling effect upon the case at bar, but simply for the purpose of calling attention to certain situations under which this court,

and virtually all courts, will dispose of property in a manner different from that which the rule in the *Engstrom* and *Sloan* cases, *supra,* might otherwise require.

The instant case does not come within these exceptions to the general rule. It does not present a question of good faith or innocent mistake on the part of either appellant or Mrs. Paul, involving a contract of marriage thought to have been entered into by and between them, and subsequently discovered to be void. On the contrary, not only was there no marriage at all, whether valid or invalid, but also is it clear that these parties never intended to enter into any marriage whatever with each other. The contract between them, if any there was, or if such it can be called, was simply an agreement or arrangement for a protracted illicit cohabitation, originated in premeditation and carried out in accordance with their deliberate choice and design. The property which they accumulated was all acquired during and in pursuance of their meretricious relationship.

The evidence further discloses that the parties, fully aware of the circumstances and conditions under which they were living and acquiring property, chose to put that property, or allowed it to be put, in the name or under the control of the one or the other, giving the property the appearance of being owned and wholly possessed by the one in whose name it stood. There is no claim or contention that such disposition was effected through any fraud or overreaching practice by either of them upon the other. The evidence points indubitably to the conclusion that, at the time of the death of Mrs. Paul, the property stood as the parties intended to place it and have it stand.

It seems to us, and we unhesitatingly say, that this case affords a perfect illustration of a situation where this court can, and should, declare that it will leave the parties exactly where it finds them with respect to their property rights, which is but another way of saying that property acquired in the manner shown by the evidence in this case must be regarded as belonging to the one in whose name the legal title to the property stands.

The theory upon which appellant instituted this action, and the sole contention which he now makes, is that, since the property, both real and personal, was bought and paid for with his individual earnings and placed in the name of the decedent, Caroline A. Paul, a resulting trust with respect to the title to the property thereby arose in his favor.

■ This contention is based upon the well-known rule of equity jurisprudence that where property, whether realty or personalty, is taken in the name of a grantee other than the person who advanced the consideration for the purchase, and the parties are strangers to each other in the sense that there is no domestic relationship between them giving rise to a meritorious consideration, a resulting trust arises in favor of the person from whom the consideration comes; and, in the absence of proof of a contrary intention on the part of the person advancing the consideration, the person in whose name the property is taken will be presumed to hold the legal title subject to the equitable ownership of the person who furnished the consideration. *Scott v. Currie,* 7 Wn. (2d) 301, 109 P. (2d) 526; Restatement of Law of Trusts, §§ 440-444; 4 Pomeroy, Equity Jurisprudence (5th ed), 71, § 1037; 54 Am. Jur. 158, Trusts, § 203; 65 C. J. 381, Trusts, § 154.

■■ An essential element of all species of resulting trusts is *intention,* and the source from which they all derive their conception and application is the equitable theory of *consideration.* The intention to create such a trust is never expressed directly in words, but equity may infer it, in proper cases, upon the ancient equitable principle that the beneficial estate follows consideration and attaches to the party from whom the consideration comes.

In 4 Pomeroy, Equity Jurisprudence (5th ed.), 62, § 1031, the doctrine of resulting trusts is explained in the following language:

"Resulting trusts, therefore, are those which arise where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go or

be enjoyed with the legal title. In such case a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner. This person is the one from whom the consideration actually comes, or who represents or is identified in right with the consideration; the resulting trust follows or goes with the real consideration."

However, the whole doctrine of resulting trusts is founded upon the principle of a presumed *intention* to create a trust; and where the facts and circumstances are such as reasonably indicate an absence of such intention or indicate a contrary intention, the principle should not be applied. 65 C. J. 366, Trusts, § 141; 4 Pomeroy, Equity Jurisprudence (5th ed.), 82, § 1040.

In Restatement of the Law of Trusts, 1250, § 404, the rule is stated as follows:

"A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of."

It is easy to understand why, in the ordinary case, where one person furnishes the consideration and the title to the property is taken in another merely for convenience or for some collateral, legitimate purpose, a resulting trust should be held to arise in favor of the person advancing the consideration. In such situation, there is no reason why the person holding the bare legal title should be held to be entitled to the beneficial interest as well. On the contrary, there is, in such case, every reason for invoking and applying the equitable doctrine that the consideration draws to itself the equitable right of property, or, otherwise expressed, that the person from whom the consideration actually moves is the true and beneficial owner of the property.

On the other hand, where, as in the case at bar, the parties have been considerably more than "domestic strangers" to each other, have by their joint efforts accumulated property while holding themselves out to the world as being

husband and wife, and, with full knowledge of the meretricious relationship under which that property has been acquired, have deliberately made disposition thereof as between themselves, there is in our opinion no ground or reason for invoking any equitable theory of resulting trust simply for the purpose of giving the property to the one rather than to the other. Under the facts of this case, there is, in our opinion, no room or reason for an equitable presumption of an intention on the part of the appellant to make himself the beneficial owner of the property and to constitute Caroline A. Paul a trustee merely holding the legal title. On the contrary, we think that, under these circumstances and in the absence of any evidence to the contrary, it should be presumed *as a matter of law* that the parties intended to dispose of the property exactly as they did dispose of it.

In the *Sloan* case, *supra,* two questions were involved: (1) whether one Samuel Sloan, the appellant, and Mary Steves had been lawfully married, and (2) whether, in the lifetime of Mary Steves, she and Sloan had made a division of the property they had acquired. This court held, upon the first question, that under the proofs in the record the parties were never lawfully married. The second question was left open for future consideration, but, in connection therewith, the court said:

"We do hold, however, that if it should appear that there was no lawful marriage between the appellant [Sloan] and the deceased [Mary Steves], that the deceased was at all times fully aware of their meretricious relations, and that in view of such relations their property was kept separate and apart; the respondents [children and grandchildren of Mary Steves] have no right or interest in the property now in controversy."

This quoted language was an explicit recognition of the right of persons living together in a meretricious relationship and acquiring property during such relationship to make a division of their property and to keep their property interests separate and apart.

If, under the facts in the case at bar, it be held that the parties made a *division* of their acquired property by permitting it to stand in the name of the one or the other, then neither of them has any right or interest in the property standing in the name of the other. If, on the other hand, it be held that the parties never made any agreement between themselves respecting a division of their property, then the situation calls for the application of the general rule above stated that property acquired by a man and a woman not married to each other but living together as husband and wife belongs to the one in whose name the title stands, in the absence of some trust relation. In either case, the result is the same.

In the *Hynes* case, *supra*, a question similar to the second question in the *Sloan* case, *supra*, was involved. From the opinion in the *Hynes* case, it appears that a man and a woman, though not married to each other, lived together as husband and wife and, during the period of their illicit cohabitation, acquired certain property, both real and personal, the title to which was taken in the names of both parties. The trial court in that case found that the parties had agreed between themselves that the property which they purchased "should be taken in the names of each of said parties, and they each owned an undivided one-half thereof." This court agreed with the trial court in holding that each of the parties owned a one-half interest in the real estate, and that they had settled their differences with reference to the personal property.

Thus, again, this court recognized the right of persons living together in illicit cohabitation and acquiring property during the period of such relationship to make such disposition of the property between themselves as they see fit. If they do make such disposition, this court will give it effect; otherwise the court will treat the property as belonging to the one in whose name the title stands.

There may be instances where a trust relation can be said to arise and govern the true ownership of property purchased with the funds of one of two persons living to-

gether in illicit cohabitation, the title being taken in the name of the other. The authors of the rule which was re-affirmed in the *Engstrom* case, *supra,* no doubt had such instances in mind, although they did not denote them specifically. What those instances may be, we need not here consider, for we are of the firm opinion that the facts of the instant case do not give rise to any trust relationship which will change the operation of the general rule that property acquired by a man and a woman, not married to each other, but living together as husband and wife, must be regarded as belonging to the one in whose name the legal title stands.

Since the real property and the postal savings account, in this case, stand in the name of Caroline A. Paul, or in the name assumed by her, they must both be regarded as belonging to her estate. The household furniture, furnishings, and equipment, however, were purchased by and in the name of the appellant, and his ownership thereof or title thereto has never been transferred by him. That property should therefore be regarded as belonging to him.

The judgment is reversed, with direction to the trial court to enter in its stead a judgment awarding the real property, the postal savings account, the jewelry, and the Plymouth sedan to the estate of Caroline A. Paul, and the household furniture, furnishings and equipment to the appellant. None of the parties will recover costs on the appeal.

MILLARD, SIMPSON, SCHWELLENBACH, and HILL, JJ., concur.

MALLERY, C. J. (dissenting)—Harvey L. Creasman met Caroline Paul sometime in 1939. They did not attempt or intend to get married, but shortly after becoming acquainted she went to live with him in Bremerton. At that time, she had three or four dollars, some personal effects, jewelry, and a 1933 Plymouth sedan. He owned a 1931 Plymouth coupe. Shortly thereafter, in 1940, he obtained employment at the Puget Sound naval shipyard, and between that time and 1947 his salary totaled $13,435.30. From this there was

deducted from his pay $1,236.25 for the purchase of war bonds.

Caroline Paul was an excellent housekeeper and handled the pay checks of Harvey L. Creasman, who left all of his financial affairs to her. A contract for the purchase of a piece of real property was entered into with one Mattie Joslin in the name of Caroline Paul. The down payment on this property was Mr. Creasman's 1931 Plymouth coupe, representing the sum of ninety dollars. Subsequent payments were made at the Hanks real estate office by Caroline Paul with Harvey L. Creasman's government checks or the proceeds therefrom. In July, 1942, a deed to the property was given in the name of Caroline A. Paul. Building materials were purchased from the White River Lumber Company and the John Dower Lumber Company, with which Harvey L. Creasman added to the house on the property in which they were living. Some of the payments for the material were made in cash by Caroline Paul and some with government checks made payable to Harvey L. Creasman.

The invoices were carried in the name of Harvey L. Creasman. A considerable amount of furniture was purchased from the Kaufman-Lebo Furniture Company and others. The accounts were carried in the name of Harvey L. Creasman. Caroline Paul opened a bank account with the Kitsap County Bank in the name of Caroline A. Creasman. Some of the deposits consisted of government checks made payable to Harvey L. Creasman. She cashed the war bonds and with the proceeds opened a postal savings account in the name of Caroline A. Creasman. After the parties had improved and furnished the house and acquired the sums mentioned heretofore in the postal savings and bank account, Caroline Paul died in October, 1946.

The court's finding that all of the money used in purchasing the property came out of the earnings of Mr. Creasman is supported by evidence clear, cogent, and convincing.

The relationship between Harvey L. Creasman and Caroline Paul is not recognized by the law. It did not constitute

a community, nor was the property acquired by the parties community property by analogy or otherwise. In the absence of a trust relationship, such property belongs to the party in whose name the property stands, and a court should not attempt to unscramble contributions in the way of services toward the accumulation of such property. *Engstrom v. Peterson*, 107 Wash. 523, 182 Pac. 623; *Beyerle v. Bartsch*, 111 Wash. 287, 190 Pac. 239; *Hynes v. Hynes*, 28 Wn. (2d) 660, 184 P. (2d) 68.

In the *Hynes* case, *supra*, there was found to be a commercial partnership in a tavern, but the proof of this fact did not depend on the parties having held themselves out as man and wife. In an action between the parties, the property was partitioned upon the basis of the partnership that was found to exist. There was no joint business endeavor in the instant case, and no facts from which a partnership could be established. Caroline Paul kept the house, and Harvey L. Creasman earned the money coming into their hands by his labors in the shipyard. Had the parties been man and wife, of course, she would have had a community interest in his wages and everything bought with them. Without a marriage, she had no interest in them. The court should not attempt to place a value on her services and trace it into any property accumulated while they lived together.

Had there been any evidence that Caroline Paul had put some of the money into any of the real or personal property acquired, the court should leave the parties where it found them, that is to say, the property would belong to the one in whose name the title stood. However, all of the money having been Harvey L. Creasman's, this is a proper case to invoke the doctrine of a resulting trust. No citations are necessary for the rule that, where one acquires title to property, either real or personal, with the money of another, it is presumed to be held in trust for the benefit of the other. The exception to this rule is where the person taking title is the natural object of the bounty of the one supplying the consideration for acquiring the property.

In *Scott v. Currie*, 7 Wn. (2d) 301, 109 P. (2d) 526, this court said:

"Where, however, a husband purchases property in the name of his wife, and pays for it with his separate funds, there is then, under such state of facts, no presumption of a resulting trust in favor of the husband, in the absence of a showing that such a trust was intended, but it is presumed, because of the relationship of the parties, and because of the husband's duty to support, that the husband intended to make a gift to his wife of the beneficial interest in the property passing under the deed. See 13 R. C. L. 1389, § 439; Ann. Cas. 1915C, 1082; 3 Scott on Trusts (1939), § 442."

The exception, of course, does not apply in the instant case. The deceased was not the wife of the appellant, nor should the law recognize any relationship upon which a natural object of bounty can be predicated.

I have but one reason for dissenting. That has to do with the effect of the majority opinion upon the law of resulting trusts, which up until now has been reasonably clear and certain in this state. The majority opinion does not key the deceased into our rule by placing her in the same category as a wife or other person who is the natural object of one's bounty, to whom the exception to the rule of resulting trust applies. Neither does it apply the rule. It characterizes the parties as something considerably more than "domestic strangers," which I am unable to classify, and concludes that they have accumulated property by their joint efforts though they were not a community and none of her money was used. The majority opinion says:

"However, the whole doctrine of resulting trusts is founded upon the principle of a presumed *intention* to create a trust; and where the facts and circumstances are such as reasonably indicate an absence of such intention or indicate a contrary intention, the principle should not be applied."

Again, the majority opinion says:

"Under the facts of this case, there is, in our opinion, no room or reason for an equitable presumption of an intention on the part of the appellant to make himself the beneficial owner of the property and to constitute Caroline A. Paul a

trustee merely holding the legal title. On the contrary, we think that, under these circumstances and in the absence of any evidence to the contrary, it should be presumed *as a matter of law* that the parties intended to dispose of the property exactly as they did dispose of it."

I find no hint anywhere in the record that the parties either divided the property between themselves or disposed of it in any manner. Had they done so, I could have agreed with the majority opinion. I think the record is clear to the contrary that these "more than domestic strangers" during the deceased's lifetime, intended to enjoy and possess the property in common. Certainly, neither of them had exclusive possession of any of it, and, certainly, there was no conveyance or evidence of agreement between them.

If the question in whose name certain property was acquired or who made certain purchases is determinative of the rights of the parties here involved, then obviously there would never be an occasion to invoke the rule of resulting trusts. I think the law of resulting trusts should apply in this case, and I cannot agree that we should raise a presumption, as a matter of law, that one has done a strange and unnatural thing. It seems strange and unnatural to me to suppose that the appellant ever intended to make such a gift to Caroline A. Paul that her heirs would take any of the property in question to the exclusion of himself, who, at no time, parted with either the possession or enjoyment of it.

Being unable to determine what if anything is left of the law of resulting trusts in the light of the holding of the majority opinion, I dissent.

BEALS and ROBINSON, JJ., concur with MALLERY, C. J.

BEALS, J. (dissenting)—I concur with the chief justice in his dissent, but I also dissent from the opinion of the majority in the following particular:

The record shows that appellant dedicated a considerable portion of his wages to the purchase of war bonds. Upon his direction, the cost of these bonds was deducted from his

pay each month. From appellant's exhibit "I," a statement received by him from the office of the fiscal officer of the Puget Sound navy yard at Bremerton, it appears that appellant, during the years 1942 to 1945, both inclusive, ordered and received nineteen twenty-five-dollar bonds and twenty-four fifty-dollar bonds, and that the first nine twenty-five-dollar bonds "showed Mrs. Caroline A. Creasman as beneficiary; all others showed Mrs. Caroline A. Creasman as co-owner."

The record does not explain the meaning of the word "beneficiary," as used in this connection, but appellant testified that the first bond he received "was payable to me, Harvey L. Creasman, and after death, to Caroline. Later, I put them in Harvey L. Creasman or Caroline Creasman." I assume that the other eight bonds referred to in the statement were payable in the same manner.

Apparently, all the other bonds ordered and paid for by appellant were payable to appellant and the deceased, Caroline A. Paul, under the name Caroline A. Creasman. I believe that the bonds issued to the two, as co-owners, could be cashed by either owner therein named, and, upon the death of one co-owner, would be payable to the survivor.

If the nine twenty-five-dollar bonds were payable to appellant, Mrs. Paul, as "beneficiary," of course had no right to cash them, and, if appellant did not endorse them, it must be assumed that Mrs. Paul signed his name thereon, acknowledging payment.

Appellant testified that he never knew that Caroline Paul had a safe-deposit box. He did testify that he was aware of the fact that she had a postal savings account, as well as a checking account. From his testimony, it appears that appellant assumed that some of the proceeds of his pay checks had been deposited by Mrs. Paul in the postal savings account.

Madeline Cook, called by appellant, testified that, at Mrs. Paul's request, the witness procured a safe-deposit box for her; that Mrs. Paul told the witness that she wanted to put the bonds in the box temporarily, stating her intention to cash them, as "the Government won't honor those bonds

after a while." The witness also testified that she saw three bonds payable to appellant, and some others which were payable to appellant and Caroline Creasman, as co-owners.

As stated by the majority, Mrs. Paul cashed all of the war bonds and deposited the proceeds in a United States postal savings account, standing in the name of Caroline A. Creasman.

It appears from the record, of course, that appellant had delivered possession of these bonds to Mrs. Paul, as he also delivered to her his pay checks, but the record does not even suggest that appellant, at any time, authorized Mrs. Paul to cash the bonds and place the proceeds thereof in the savings account, in her own name only, or that he knew that she had done so.

On appellant's order, nine of the twenty-five-dollar bonds were issued to him in his own name, with Mrs. Paul named thereon as beneficiary; the remainder of the bonds having been issued to appellant and Mrs. Paul as co-owners. So far as the record shows, that was the arrangement made by appellant, and no subsequent change in that status, made by Mrs. Paul without appellant's knowledge, should change his right to the war bonds or the proceeds thereof.

In my opinion, it should be held from the record that, concerning the war bonds, a change of status was effected by Mrs. Paul, whether with fraudulent intent, or intent to overreach appellant, is, in my opinion, immaterial, as the effect upon appellant's present status is the same, so long as Mrs. Paul's actions were without appellant's knowledge or approval.

For the reasons stated, it seems to me that, at the time of Mrs. Paul's death, the proceeds of the war bonds did not stand as the parties originally placed them and intended them to stand.

The proceeds of the nine war bonds payable to appellant, with Mrs. Paul named as beneficiary only, should be awarded to him, if it be the fact that, under the government regulations, a "beneficiary" named upon such a bond has a right to the proceeds thereof only upon the death of the payee.

As to the other war bonds, if, pursuant to the applicable government regulations, bonds payable to two persons, as co-owners thereof, are, upon the death of one co-owner, payable to the survivor, the proceeds of all the other bonds should also be awarded to appellant. If, on the other hand, under the government regulations, such bonds as those here in question, payable to two persons, as co-owners, are, upon the death of one co-owner, payable one half to the survivor and the other one half to the heirs of the deceased co-owner, then the proceeds of those bonds should be divided between appellant and Mrs. Paul's heirs at law.

While agreeing with Chief Justice Mallery's dissent, I am also of the opinion that, under the conclusion reached by the majority, the ownership of the proceeds of the war bonds, for which I assume appellant paid approximately twelve hundred dollars, should be awarded to appellant, or the case remanded to determine any doubtful facts in connection with matters above discussed.

---

September 28, 1948. Petition for rehearing denied.