[No. 32432-2-I.   Division One.   May 23, 1994.]

SHANNON CONNELL, *Appellant,* v. RICHARD FRANCISCO, *Respondent.*

*Jacob Cohen* and *Cohen, Manni & Theune; Malcolm L. Edwards, Charles K. Wiggins,* and *Edwards, Sieh, Wiggins & Hathaway, P.S.,* for appellant.

*H. Clarke Harvey* and *Kelly & Harvey Law Offices,* for respondent.

PEKELIS, J. — Shannon Connell appeals the trial court's distribution of property following the termination of her "meretricious relationship"[1] with Richard Francisco. Connell contends the court misapplied the rule of *In re Marriage of Lindsey*[2] by failing to order a "just and equitable" disposition. She also argues that the court should have applied the community property presumption in determining the

---

[1]*See Peffley-Warner v. Bowen,* 113 Wn.2d 243, 246 n.5, 778 P.2d 1022 (1989) (though term "meretricious" is offensive, demeaning, and sexist, courts will continue to use it until a better expression emerges).

[2]101 Wn.2d 299, 678 P.2d 328 (1984).

character of the assets subject to distribution. Francisco cross-appeals, contending that the trial court should not have awarded one-half of the increase in his pension plan to Connell because she had no legally cognizable interest in it.

## I

Shannon Connell met Richard Francisco at a Toronto hotel in June 1983 while Connell was a dancer in a show produced by Francisco. At the time, Connell, who had a degree in dance education, was a waitress living in New York City. Francisco, who lived in Las Vegas, was the producer of the show.

A relationship developed between Connell and Francisco. In October 1983 Connell visited Francisco at his Las Vegas home for 2 weeks. Connell subsequently moved to Las Vegas to live with Francisco.

At this time, Connell had little in terms of property and assets other than her clothing and a leasehold interest in an apartment in New York. Francisco, on the other hand, was a wealthy man. He was the sole owner of a Nevada corporation, Prince Productions, Inc., which produced stage shows for hotels. He also owned a significant amount of real property in the Las Vegas, Nevada, area. As of February 1984, he had a net worth of over $1,300,000.

The parties resided and cohabited in Francisco's Las Vegas home from November 1983 through June 1986. Francisco's corporations continued to produce profitable stage shows at various hotels,[3] and Francisco was paid a salary for his services to these corporations. Francisco's decisions about how much to draw as salary were based on the amount of money available to the corporation but not needed for other corporate purposes.

During this period Connell worked as a paid dancer in various stage shows, some of which were produced by Francisco.

---

[3]In addition to owning Prince Productions, Francisco was the sole owner of Las Vegas Talent, Ltd., which performed the same function as Prince and operated out of the same offices, but, apparently, produced different shows. At trial, Francisco testified that Las Vegas Talent had incorporated and commenced business in 1980 or 1981, but income from Las Vegas Talent does not appear in any of Francisco's financial statements until June 30, 1985.

She also worked on an intermittent basis in various aspects of Francisco's business enterprises. She was paid for some but not all of these services. It is undisputed that all payments related to the Las Vegas home were made by Francisco, all business assets acquired during this time were paid for by Francisco, and title to all real property purchases was taken in the name of Prince Productions or Francisco individually.

In 1986 Prince Productions purchased a bed and breakfast on Whidbey Island in the State of Washington. Shortly thereafter Connell moved to Whidbey Island and commenced work as the manager of the business, known as the Whidbey Inn. Subsequently Francisco moved to Whidbey Island to join her. From June 1986 through the end of the relationship in 1990, the parties resided and cohabited on Whidbey Island. While living on Whidbey Island, the parties were viewed by many in the community as married. For many business purposes connected with the Whidbey Inn, Connell held herself out as married to Francisco and used the name Francisco. Francisco was aware of and acquiesced in this conduct. In addition, Francisco gave Connell an engagement ring and had a prenuptial agreement prepared. Both parties underwent surgery that had the effect of improving their fertility.

Connell served as the manager of the Whidbey Inn until September 1990; from 1986 to 1988 she received no salary for these services.

During this period Prince Productions and Francisco continued to acquire property, including properties on Whidbey Island that Francisco and Connell used as residences, and a condominium in Las Vegas.[4] Francisco commenced a restaurant business on Whidbey Island. In addition, in December 1988 Francisco produced another highly profitable stage show for a hotel in the Bahamas.[5]

As before, and in addition to her work as the manager of the Whidbey Inn, Connell devoted uncompensated services to

---

[4]Francisco sold his other home in Las Vegas for approximately $220,000.

[5]Francisco set up a corporation in the Bahamas, known as KMA, Ltd., to control the finances of this production. Francisco diverted the income from KMA to Prince Productions. By 1990, the Bahamas show generated weekly salary of $5,000 for Francisco.

Francisco's business enterprises; she was personally involved in many of the real property purchases and in the various businesses owned by Francisco. Nonetheless, as before, Connell did not contribute any monetary funds toward the purchase of any property acquired by Francisco or Prince Productions during the relationship. All property acquisitions remained in the name of Francisco individually or in the name of Prince Productions.[6]

The parties separated in March 1990.[7] Connell continued to manage the Whidbey Inn until September 1990 at a salary of $400 per week. At the conclusion of the relationship Connell had $10,000 in savings, her clothing, an automobile, $10,000 worth of jewelry given to her by Francisco, and her leasehold interest in the New York City apartment. Francisco, on the other hand, was being paid $5,000 a week by Prince Productions, and he owned a valuable corporation as well as a great deal of valuable real and personal property. As of January 1990, Francisco's net worth was over $2,700,000. This represented a net increase of over $1,400,000 during the 6 years of the parties' relationship.

Connell commenced a lawsuit against Francisco in December 1990, seeking a division of property acquired during the course of the parties' relationship. The action was tried to the bench. The court determined that the parties' relationship was sufficiently long term and stable to come within the rule requiring a just and equitable division of property acquired during that relationship.

Next, the court determined that RCW 26.09.080 "does not specifically apply to the division of property acquired during a meretricious relationship but may apply to the division by analogy". The court thus used "the analogy of community

---

[6]At one point Connell was appointed vice president of Prince Productions. Both parties acknowledge, however, that this appointment was for the sole purpose of claiming a tax deduction for expenses incurred when Connell traveled with Francisco.

[7]Connell assigns error to a finding of fact that January 1990 was the date the relationship terminated, arguing that March 1990 is the correct date. There is nothing in the record to support the trial court's finding, and on appeal Francisco has not disputed this assignment of error.

property and separate property", but concluded that "[o]nly property that would be considered community property had the parties been married is subject to division and distribution". Hence, the court flatly declined to consider awarding to Connell any property characterized as the separate property of Francisco, nor did it expressly consider the duration of the relationship or the economic circumstances of each party at the time of the property division. Additionally, finding that "the community property presumptions are not applicable", the court placed the burden of proof on Connell to establish the community character of the property.

Finally, the court concluded that Connell had failed to establish by a preponderance of the evidence the community character of any of the real property or of the increased value of the great majority of Francisco's assets. The court found, *inter alia*, that Connell had not contributed any monetary funds toward the purchase of any property acquired by Francisco, and that in contributing her services to Francisco's business ventures, Connell had helped "as a wife would help a husband on an intermittent basis, that is, helping out as needed". The court further found that "[t]here was no pooling of resources and services for joint projects in any business sense". As for the Whidbey Inn, the court determined that it was not "a joint venture of Mr. Francisco and Ms. Connell, nor did they have an implied partnership for its ownership and operation".

The only property characterized by the court as community was the increased value of Francisco's contributions to a pension plan. Noting that pension plan contributions "are essentially compensation", the court concluded that the increased value of $169,000 "would be considered community property if the parties had been married". Accordingly, the court concluded that half the increase in value would be "a just and equitable division of the property to Shannon Connell with regard to the property acquired during the relationship". The remainder of the property was "confirmed in Richard Francisco", and the trial court entered judgment accordingly.

Connell appeals, and Francisco cross-appeals.

## II

The central issue in this case is whether the trial court misapplied the rules applicable to the division of property acquired during a meretricious relationship. Both parties contend that the court failed to correctly apprehend the precedent of *In re Marriage of Lindsey, supra.*

In *Lindsey*, the Supreme Court expressly abandoned and overruled what had been known as "the *Creasman* presumption". According to this rule, property acquired by a man and a woman not married to each other, but living together as husband and wife, was not community property, but rather was presumed as a matter of law to belong to the one in whose name the legal title to the property stood. *Creasman v. Boyle*, 31 Wn.2d 345, 196 P.2d 835 (1948).

In place of the "constricting dictates of the *Creasman* presumption", the *Lindsey* court adopted

> the rule that courts must "examine the [meretricious] relationship and the property accumulations and make a just and equitable disposition of the property." *Latham v. Hennessey*, [87 Wn.2d 550, 554, 554 P.2d 1057 (1976)]. *Cf.* RCW 26.09.080.

(Citations omitted). 101 Wn.2d at 304.

The dispute in the present case arises from the *Lindsey* court's reference to RCW 26.09.080.[8] The Supreme Court did not elaborate on the extent to which the principles of section .080 ought to govern the disposition.[9] We turn first to Francisco's cross appeal, in which he contends that RCW 26.09.080 has no application whatsoever.

---

[8]RCW 26.09.080 provides in pertinent part:

"In a proceeding for dissolution of the marriage, legal separation, [or] declaration of invalidity . . ., the court shall, without regard to marital misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:

"(1) The nature and extent of the community property;

"(2) The nature and extent of the separate property;

"(3) The duration of the marriage; and

"(4) The economic circumstances of each spouse at the time the division of property is to become effective . . .".

[9]"*Cf.*", which precedes the citation to section .080 in *Lindsey*, is defined as follows: "Cited authority *supports a proposition different from the main proposition but sufficiently analogous to lend support.* Literally, *cf.* means 'compare.'" Harvard Law Review Ass'n, *A Uniform System of Citation* 23 (15th ed. 1991).

Francisco contends that "*Lindsey* does not hold that the principles of RCW 26.09.080 should be applied to meretricious relationship cases either directly or by analogy". Consequently, according to Francisco, Connell was entitled to little or nothing because community property law is wholly inapplicable to meretricious relationships. We disagree.

█ Both before and after *Lindsey*, the opinions of this court have invoked RCW 26.09.080 as the touchstone for disposition of property at the termination of long-term meretricious relationships. *See Warden v. Warden*, 36 Wn. App. 693, 698, 676 P.2d 1037 (the provisions of RCW 26.09.080 "govern the disposition of the property acquired by [the parties to a] relationship which is tantamount to a marital family"), *review denied*, 101 Wn.2d 1016 (1984);[10] *Foster v. Thilges*, 61 Wn. App. 880, 886, 812 P.2d 523 (1991) ("*Warden* and *Lindsey* make clear that the couple's property is to be divided justly and equitably, applying community property principles set forth in RCW 26.09.080."); *see also* Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 Wash. L. Rev. 13, 24 (1986) ("The adoption of a rule requiring a just and equitable disposition suggests application of the approach used in marriage dissolution cases . . .."); Terrence v. Sawyer, *Dissolution of Marriage in Washington* § 7.04(D) (1992) ("RCW 26.09.080 governs the disposition of property at the termination of a long-term, stable, pseudo-marital relationship as well.").

Thus, the principles of RCW 26.09.080 have plainly been incorporated into a common law rule applicable to the disposition of property following a meretricious relationship.

According to Francisco, however, this court has misconstrued *Lindsey*, which he contends merely sought to protect one party to a meretricious relationship "from being unjustly enriched from the labor and financial contributions of the other party". He concludes, therefore, that because there

---

[10]Francisco makes much of the fact that the *Warden* opinion was filed 12 days before the *Lindsey* opinion, and argues that the *Lindsey* court's silence regarding *Warden* somehow reflects the Supreme Court's intent to overrule *Warden*. We decline to infer such an intent, finding the two cases to be entirely consistent.

was no evidence of Connell's contributing directly to the increased value of his pension, she has no claim to it.

For this narrow view of the *Lindsey* holding, Francisco relies on *Peffley-Warner v. Bowen*, 113 Wn.2d 243, 778 P.2d 1022 (1989). In *Bowen*, the Ninth Circuit had certified the question of whether a woman partner to a meretricious relationship had the same status as a wife under Washington's intestate succession laws with respect to the personal property of the deceased partner. 113 Wn.2d at 245. The court held that because the surviving partner was not a "spouse", she could not inherit a share of the deceased partner's estate under Washington's law. 113 Wn.2d at 253. In reaching this result, the *Bowen* court explained that *Lindsey* had not equated a meretricious relationship with a marital relationship, but merely had "sought to avoid unjust enrichment of one partner at the expense of the other." 113 Wn.2d at 252.

As Francisco points out, our courts have consistently refused to extend certain statutory benefits to partners in a meretricious relationship. *See Davis v. Department of Empl. Sec.*, 108 Wn.2d 272, 279, 737 P.2d 1262 (1987) (unmarried cohabitant ineligible for benefits triggered by "marital status" under unemployment compensation statutes); *Western Comm'ty Bank v. Helmer*, 48 Wn. App. 694, 740 P.2d 359 (1987) (RCW 26.09.140, which permits an award of attorney fees and costs for maintaining or defending a proceeding under RCW 26.09, is inapplicable to property division between parties involved in a meretricious relationship); *Roe v. Ludtke Trucking, Inc.*, 46 Wn. App. 816, 732 P.2d 1021 (1987) (under wrongful death statute an unmarried cohabitant is not included within the statutory category of "wife").

There is no intractable conflict between the outcome in these cases and the rationale of *Lindsey, Warden*, and *Foster*, however. As the Supreme Court has explained, even though the division of property between unmarried cohabitants is analogous to that between spouses at dissolution of marriage, "the extension of property distribution rights of spouses to partners in meretricious relationships does not elevate meretricious relationships themselves to the level of

marriages for any and all purposes." *Davis*, at 279. The distinction lies in the express statutory character of marital status in the cases relied upon by Francisco. In interpreting the wrongful death statute, the unemployment compensation statutes, and the intestate succession statutes, the courts have declined to impute to the Legislature an intent to extend statutory benefits beyond the plain statutory terminology, *i.e.*, the bright line of marriage.[11]

In *Lindsey* and *Warden* the courts did not interpret RCW 26.09 to include unmarried cohabiting partners. Rather, these courts adopted a *common law rule*, applicable to property divisions following termination of qualifying meretricious relationships, which assimilated the provisions of RCW 26.09.080.

The illusory nature of Francisco's argument is plainly demonstrated by the outcome of *Foster v. Thilges, supra*. In *Foster*, this court affirmed the trial court's decision to follow *Warden* in dividing the property acquired during the parties' relationship "*applying community property principles set forth in RCW 26.09.080.*" (Italics ours.) 61 Wn. App. at 886.

Yet the *Foster* court declined to award attorney fees on appeal under RCW 26.09.140, citing *Helmer*. Plainly, the *Foster* court found no inconsistency in incorporating the provisions of RCW 26.09.080 into a common law rule of nonmarital property distribution while simultaneously declining to apply RCW Title 26 generally to such relationships.

Accordingly, we conclude that Francisco's argument is without merit. The provisions of RCW 26.09.080 and community property principles do apply when distributing the assets of a meretricious relationship.

In the present case, the trial court correctly concluded that RCW 26.09.080 applied by analogy, but in making its disposition the court applied section .080 only in part. Hence, we turn to the issue raised by Connell's assignment

---

[11]Similarly, in *Continental Cas. Co. v. Weaver*, 48 Wn. App. 607, 611, 739 P.2d 1192 (1987), the court found that a cohabiting partner was unambiguously outside of the common meaning of the *contractual* term "immediate family" and therefore not entitled to insurance coverage.

of error: whether it was an abuse of discretion to ignore certain principles of RCW 26.09.080 and to limit the distribution to property that would have been characterized as community had the parties been married.

In making a just and equitable distribution, section .080 instructs the court to consider the nature and extent of the parties' property and the economic circumstances of the parties; it also permits an award of part or all of one party's separate property to the other. These are flexible guidelines intended to ensure an equitable disposition by taking into account the particular circumstances of a case. *See In re Marriage of Kittleson*, 21 Wn. App. 344, 351-52, 585 P.2d 167 (1978), *review denied*, 92 Wn.2d 1009 (1979). In making a just and equitable distribution, the economic condition in which a decree will leave the parties is "the paramount concern". *In re Marriage of Kraft*, 61 Wn. App. 45, 50, 808 P.2d 1176 (1991), *aff'd*, 119 Wn.2d 438, 832 P.2d 871 (1992); *In re Marriage of Pilant*, 42 Wn. App. 173, 178, 709 P.2d 1241 (1985). Moreover, the character of the property does not control its disposition. *e.g., In re Marriage of Parks*, 58 Wn. App. 511, 514, 794 P.2d 59 (1990), *review denied*, 116 Wn.2d 1009 (1991).

Similarly, in addressing the situation of nonmarital relationships, the *Lindsey* court fashioned a flexible rule that would do away with the "constricting dictates" of prior law. 101 Wn.2d at 304. In adopting the principles of RCW 26.09.080 as the common law rule applicable to nonmarital property distributions, and in expressly requiring a just and equitable disposition of the property, the courts have adopted as public policy the legislative policies represented in section .080.

■ The piecemeal and formalistic approach used by the trial court in this case is inherently inconsistent with the flexibility needed in making a just and equitable disposition. To exclude from consideration certain assets, *i.e.*, those characterized as separate property, regardless of their extent, would render it impossible in many cases to address the "paramount concern" of a just and equitable division based on

the economic circumstances of the parties.[12] Here, it is undisputed that there was a great disparity in the parties' respective economic circumstances at the time of trial, and that Francisco's economic position had greatly increased during the relationship, while Connell's had not. Yet the trial court failed to articulate any basis in justice and equity for its distribution in this case. In its oral opinion, the court merely cited the *Community Property Deskbook*, which suggests that property that is characterized as separate is not subject to distribution under the *Lindsey* rule. *See* Washington State Bar Ass'n, *Community Property Deskbook* § 2.64, at 2-7 (2d ed. 1989). We reject this proposition.

In deciding what constitutes a "just and equitable distribution", the court's failure to consider each of the applicable factors was error. In particular, the trial court should have considered the economic circumstances of the parties and whether an award of Francisco's separate property was necessary to achieve a just and equitable distribution. Thus, we conclude that the trial court exercised its discretion on untenable legal grounds, which constitutes a manifest abuse of discretion. *Kraft*, at 50.

We therefore remand for the trial court to consider a division of property under the correct legal standard, articulated herein.

### III

In a related contention, Connell also asserts that the trial court erred by refusing to apply the community property presumption in characterizing the parties' property subject to distribution.

In the marital context, there is a presumption that all property onerously acquired by either spouse during marriage is community property. *E.g., Colpe v. Lindblom*, 57 Wash. 106, 114, 106 P. 634 (1910).[13] Where the source of any

---

[12]Whether Francisco's assets were properly characterized as separate is addressed in part III of this opinion, *infra*.

[13]The character of property is determined as of the date of its acquisition. *E.g., In re Marriage of Shannon*, 55 Wn. App. 137, 140, 777 P.2d 8 (1989). Prop-

particular asset is unclear, its status as separate or community property is determined by resort to the presumption, which may be overcome by clear and convincing evidence of the property's separate character. *Estate of Madsen v. Commissioner*, 97 Wn.2d 792, 796, 650 P.2d 196 (1982), *overruled on other grounds by Aetna Life Ins. Co. v. Wadsworth*, 102 Wn.2d 652, 689 P.2d 46 (1984). If there is any confusion or uncertainty in tracing an asset to a separate property source, the uncertainty will be resolved in favor of a finding of community character. Harry M. Cross, *The Community Property Law in Washington (Revised 1985)*, 61 Wash. L. Rev. 13, 56 (1986). The fact that title has been taken in the name of one spouse does not, in itself, rebut the presumption. *Merritt v. Newkirk*, 155 Wash. 517, 520, 285 P. 442 (1930) (title in one spouse has no significance in characterizing property as community or separate).

▆ Whether the community property presumption applies under the *Lindsey/ Warden* rule has not been directly decided.[14] We believe that the presumption cannot rationally be severed from the obligation to divide property justly and equitably by analogy according to the principles of RCW 26.09.080. In large measure, application of RCW 26.09.080 in the meretricious relationship context would be meaningless without the presumption.

Failure to apply the community property presumption places the burden of proof on the nonacquiring partner to establish the character of disputed property. This, in effect, revives the *Creasman* presumption overruled in *Lindsey*. Under *Creasman*, as noted earlier, property acquired during a meretricious relationship was not community property and was presumed as a matter of law to belong to the party with legal title. 31 Wn.2d at 356.

---

erty owned before marriage retains its character as separate property unless its character is changed. *See In re Marriage of Hurd*, 69 Wn. App. 38, 50, 848 P.2d 185, *review denied*, 122 Wn.2d 1020 (1993).

[14]*But cf. In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865, 855 P.2d 1210 (1993) (invoking community property presumption in review of property distribution under the *Lindsey* standards).

This is precisely what occurred here. As in *Creasman*, the trial court deemed the property acquired by Francisco to belong to Francisco, the party with legal title, unless Connell could by a preponderance of the evidence establish its community character, *i.e.*, that it would have been community property had the parties been married. Such a result subverts the purpose of *Lindsey* and related cases.

We conclude that the community property presumption is an inherent characteristic of community property in Washington. Where a meretricious relationship is proved to be sufficiently long term and stable to come within the rule of *Warden* and *Lindsey*, the trial court is obliged to characterize the parties' property as if it were characterizing marital property. In other words, if property would have been characterized as community had the parties been married at the time of its acquisition then it must be treated as if it were community property. Because the trial court characterized the property in this case without applying the presumption, the trial court erred.

Here, valuable assets were acquired in Francisco's name, or in the name of a corporation owned by him, during the parties' relationship. It is clear that Connell contributed uncompensated labor to Francisco's business enterprises, which in turn generated profits that were used to make further acquisitions. Yet other than the testimony of Francisco himself, there is little or nothing in the record tracing the source of the funds used to acquire these disputed assets. Some of the acquisitions involved a series of transactions originating only initially from indisputably separate sources, while for others, such as Francisco's interest in Las Vegas Talent, Ltd., even the date of acquisition is unclear.

In the context of a marital property disposition under similar circumstances, the community property presumption would ordinarily benefit the party asserting that disputed property was community in nature.[15] The trial court's failure

---

[15]*See State ex rel. Marshall v. Superior Court*, 119 Wash. 631, 637, 206 P. 362 (1922) (when time or manner of acquisition not established, possession enough

to apply the community property presumption in this case surely affected the characterization of much of the disputed property, and a proper characterization would, no doubt, have resulted in a more equitable distribution. Hence, we remand and direct the trial court to divide the property fairly and equitably according to the principles of RCW 26.09.080 and using the community property presumption.

WEBSTER, C.J., and BAKER, J., concur.

Review granted at 125 Wn. 2d 1008 (1994).

to raise presumption that asset is community property); *Pollock v. Pollock*, 7 Wn. App. 394, 400, 499 P.2d 231 (1972) (mere assertion that acquisition was by use of separate funds does not overcome the presumption; there must be clear tracing of the separate property source into the controverted asset); *In re Marriage of Janovich*, 30 Wn. App. 169, 171, 632 P.2d 889 (burden on party asserting separate nature of property is not satisfied by "the mere self-serving declaration of the spouse claiming the property" that separate funds were used or a showing that separate funds were available) (quoting *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)), *review denied*, 95 Wn.2d 1028 (1981); *Mumm v. Mumm*, 63 Wn.2d 349, 352, 387 P.2d 547 (1963) (if separate and community funds have been commingled and it is no longer possible to distinguish or apportion them, all commingled funds or the property acquired thereby is community); Cross, *supra* at 56 (where there have been several transactions leading to the acquisition of an asset "if the character of one of the links is confused or uncertain, the basic community property presumption . . . breaks the chain . . . [and] the uncertain link will be found to be community in character and to be the origin or source with respect to any subsequent change in form").