[No. 30163. Department One. August 14, 1947.]

JACK HYNES, *Appellant,* v. FRANCES HYNES, *Respondent.*[1]

[1]Reported in 184 P. (2d) 68.

*Fred M. Bond,* for appellant.

*John T. Welsh* and *Charles B. Welsh,* for respondent.

ABEL, J.—Plaintiff and defendant met in Anchorage, Alaska, in the year 1937. At that time, and since, plaintiff was a single person. Defendant was then married to a man by the name of Quetschke. Shortly after they met, plaintiff learned that defendant was a married woman. Plaintiff testified that he left Alaska for Seattle, and, two or three weeks later, he met defendant there after she got off the Alaska boat. They went to Seaview and held themselves out as husband and wife.

A contract was entered into for the purchase of certain real estate from a man by the name of Abrams and his wife. Plaintiff claimed that defendant did not sign this contract, and that the down payment was made by himself out of his own funds; however, this contract was not introduced in evidence. Plaintiff testified, in reference to this contract and the fact that it was refinanced by a man named DeMuth, as follows:

"A. Well, supposed to pay so much a month. We,—I paid so much down and we were supposed to pay it out of the business, the rest, to pay up on the property. It was taken out of the business. Q. Taken out of the business. Now, it went along that way for some time? A. Went along for a year. Q. And then what was done with reference to the property, real property? A. Well, we got Mr. DeMuth to take the contract over. . . . Q. Then you had a contract with DeMuth, did you? A. That is right. Q. Did Mrs. Hynes sign that, Frances? A. She signed that."

The plaintiff testified that the balance of the DeMuth contract was fifteen hundred dollars, and that this was to be paid out of the proceeds from the tavern business which was located upon the property. Referring to this contract, plaintiff testified:

"Q. That contract was finally paid up? A. Paid out through the business of the tavern. Q. That is right. Now, at that time you and Frances Hynes, now Mrs. Carlson, had a license to operate a tavern on this property? A. (Nodding head affirmatively) Q. (Continuing) Of the real estate in both of your names? A. It was, yes. Q. Both of your names. Then the business was operated in the name of Frances Hynes,—Jack Hynes and Frances Hynes until you leased the property to Mr. Goulter and Mr. Spencer? A. That is right. Q. Then Mr. Goulter and Mr. Spencer took over the license from you and the defendant, that is right? A. Correct."

The plaintiff testified that the rentals received paid up the balance of the DeMuth contract, and then testified as follows:

"Q. Yes. And then DeMuth executed a deed, that is right? A. Uh-huh, that is right. Q. And the deed ran from the DeMuths, H. W. DeMuth and Della DeMuth, husband and wife, to Jack Hynes and Frances Hynes of Seaview, Washington, that is right? A. That is right."

At the time these parties went to Seaview, defendant took some personal property of her own, consisting of furnishings, which was placed in the house and in the tavern located upon the real estate. The parties lived in the house together and were generally known in that locality as husband and wife. Defendant signed her name either as Frances Hynes or Mrs. Jack Hynes.

At about the time they started to operate the tavern, plaintiff opened an account in the First National Bank at Ilwaco. This account was opened in the name of Jack Hynes. However, the plaintiff and the defendant both signed an authorization card at the bank, which authorized the defendant to sign checks drawn upon this account. On April 30, 1940, plaintiff made, executed, and delivered to "Frances Hynes, my wife," a power of attorney, which is general and

gave her full authority to act for him. Shortly thereafter, he left for Alaska, while defendant remained in Seaview and took care of the business. Plaintiff testified that defendant ran the tavern business during the time he was in Alaska and before they leased the property. She was in charge, bought the liquors and beer supplies and paid for them, and, as far as plaintiff knew, she deposited all of the moneys received in the bank account. Plaintiff returned from Alaska in December, 1940, and stayed in Seaview until the following May, when he again went to Alaska and stayed until September, 1944.

Plaintiff testified that improvements were made; that he did some work fixing up the property; and that the cost of the improvements and furniture that they purchased was paid for out of the proceeds of the tavern. He stated that he had had an operation in Astoria in 1938 or 1939; that the doctor bill was one hundred fifty or one hundred seventy-five dollars, and the hospital bill was seventy-five dollars, and that these bills were paid out of the tavern account, but he claimed that this expense was covered by insurance.

The original complaint in this case was based upon a contract of marriage which plaintiff claimed the defendant refused to go through with. However, in regard to this, plaintiff testified as follows:

"Q. You knew she was married when she went with you to Seaview? A. Absolutely. Q. Did you have a contract with her to marry? A. We didn't have a contract. We talked it over now and then. Q. There was no specific contract? A. No. We couldn't get married before she had a divorce. Q. Then you had no agreement to marry her? A. We talked it over. It was best to get a divorce then get married, living in a community like that. . . . Q. Did she agree to marry you? A. No, she didn't, she did at first. We talked it over,—said probably later. THE COURT: I didn't understand that answer. A. She said, 'Perhaps later we'll get married.' Q. She didn't positively agree to marry you? A. Well, we talked it over."

Plaintiff claimed that he did not know defendant had married Carlson, during the time that plaintiff was in

Alaska, until after he returned to Seaview in September, 1944.

Defendant made the claim, and the trial court found, that the parties settled all of their differences as to money and personal property, and, in connection with that question, plaintiff testified:

"Q. All right. Well, at any rate you and Frances settled as to the bank account, didn't you? A. Presumably so. I had to, the bank account wasn't even in my name any more. Q. The bank account wasn't in your name any more? A. No, it wasn't, Mr. Welsh. Q. It was transferred? A. Seems like it was. Q. Well, do you know that it was? A. Well, it was. Mr. Lochrie told me it was. MR. WELSH: I move to strike what Mr. Lochrie told him. THE COURT: It is a voluntary statement. I think it ought to go out. Q. Now, Mr. Hynes, whose name was it in? A. It was in Mrs. Frances Hynes,— it was Mrs. Frances Hynes Carlson then. Q. Well, at any rate you settled as to the bank account? A. Yes. Q. That is a fact. And you divided the monies between you? A. Uh-huh. Q. She gave you a check for $380.31? A. That is right. Q. And you cashed the check? A. Uh-huh."

Plaintiff claimed that the bank account was, at that time, in defendant's name and not in his name, although the testimony of the bank cashier and the defendant indicates that the bank account had not been changed. The check was introduced in evidence and appeared to be the same kind of a check that defendant had theretofore written. Plaintiff testified concerning this settlement as follows:

"Q. Now, Mr. Hynes, at the time you went to see Mr. DeMuth didn't you and Frances talk over you buy her interest or she buy your interest as to the real property? A. Uh-huh, we talked it over, yes. . . . Q. Did you agree to sell your interest or your half interest to her? A. I agreed at that time, yes. Q. She wanted to sell you her half interest and you wanted to sell her your half interest? A. She didn't want to sell nothing as far as I could understand. Q. How much did she ask for her half interest? A. Two thousand dollars. Q. How much did you ask for your half interest? A. Two thousand dollars. Q. You practically agreed to settle that time, didn't you? A. Well, not necessarily, just talked it over. . . . Q. Well, you talked to Mr. DeMuth? A. I didn't talk to Mr. DeMuth.

Q. Never about that matter? A. Not before,—later. Q. At or about that time didn't you talk to Mr. DeMuth at Seaview as to the value of the property? A. I talked to him about the value. I asked him what he thought the value of the property was."

The trial court made extensive findings of fact. In finding No. 1, the trial court, among other things, found that plaintiff and defendant agreed to come to the United States and get into some business together, and, in finding No. 2, the trial court found that they entered into a contract with a man named Abrams and his wife to purchase the real estate in controversy in this action. While in Seaview, before they purchased or agreed to purchase the property, they lived together as husband and wife, and, while in Seaview, plaintiff at all times introduced defendant to his friends as Mrs. Hynes, and defendant went by the name of Mrs. Hynes. Everybody believed them to be husband and wife. Finding No. 3 reads as follows:

"Thereafter Abrams and wife sold the property to a man named DeMuth and his wife, and then plaintiff and defendant entered into a written contract with DeMuth and wife for the purchase of the real property in controversy, plaintiff signing his name as Jack Hynes and defendant signing as Frances Hynes. This contract is defendant's Exhibit No. One. The first or initial payment on the contract with DeMuth and wife was made by Jack Hynes by giving to the First National Bank at Ilwaco a draft or check on a bank or banks in Alaska, and plaintiff and defendant opened an account in the First National Bank at Ilwaco, Washington, in plaintiff's name, wherein all the money received by defendant were placed in the account of Jack Hynes in the said bank at Ilwaco, Washington. Jack Hynes, plaintiff, gave the bank an instrument in writing wherein he ordered the bank to recognize and pay any check drawn on said account by Mrs. Hynes, the defendant, the bank believing Frances Hynes, the defendant, to be the wife of said plaintiff. He introduced her as such to DeMuth and wife and also to the banker."

Finding No. 4, in part, is as follows:

"That after the contract was executed between Abrams and wife and Jack Hynes and Frances Hynes, the plaintiff and defendant, under the name of Jack Hynes and Frances

Hynes, applied to the Liquor Control Board of the State of Washington for a license, and a license was issued to Jack Hynes and Frances Hynes for a tavern. Plaintiff and defendant at that time lived at Seaview, Washington, in a house on the premises in question, and they operated a tavern in another building on said premises, selling beer and wine. This continued until they leased the property and tavern to Goulter and Spencer. Defendant sold all the goods, wares, and merchandise which were kept in the tavern for sale, and she paid for all these goods, wares, and merchandise by cash, and the rest of the proceeds for the sale of the said goods in the tavern she deposited in the account of Jack Hynes in the First National Bank at Ilwaco, Washington. The contract between DeMuth and wife provided that when the amount agreed upon by the parties for the purchase of the property in said contract was paid in full the deed was to be delivered conveying the property in controversy here to Jack Hynes and Frances Hynes, their heirs and assigns forever. Thereafter, the transaction having been completed and the contract having been paid in full, H. W. DeMuth and Della DeMuth, husband and wife, for the sum of One Thousand Five Hundred Dollars, conveyed unto Jack Hynes and Frances Hynes, their heirs and assigns forever, all of the land described in plaintiff's complaint and in defendant's answer herein."

In finding No. 5, the court found, in part, as follows:

"That while Mr. Hynes was in Seaview, the defendant acted as barmaid in the tavern. She bought all of the goods, wares, and merchandise used in the tavern and paid cash for the same when delivered. The Liquor license was taken in the names of both parties and she paid out the following sums of money in operating the tavern: . . .

"Defendant received no salary, but she took her living expenses out of the proceeds of the tavern when she and Mr. Hynes lived together in the house in Seaview and while he was in Alaska. While plaintiff was in Alaska, defendant ran the tavern alone. That all of the above items were paid out of the bank account in plaintiff's name in the First National Bank at Ilwaco, Washington, and they nor either of them had any other account. That defendant placed all the monies she received from the tavern in the account of Jack Hynes in said bank except what she paid out in cash for the goods, wares, and merchandise which were used in said tavern. The court finds that in 1943 Hynes paid for the premium on his own life insurance policy."

In finding No. 6, the court found that defendant brought from Oregon some household goods and furniture, which belonged to her, and placed them in the buildings on the premises.

Finding No. 7 is as follows:

"That defendant was divorced from her husband in the year 1938, but there never was any agreement between plaintiff and defendant that they would marry. Defendant never at any time agreed to marry plaintiff."

Finding No. 9 is as follows:

"That at the time of the purchase of the above described real and personal property it was agreed between plaintiff and defendant that whatever property they purchased should be taken in the names of each of said parties, and they each owned an undivided one-half thereof."

Finding No. 10 is as follows:

"That with reference to the monies received by the defendant and with reference to the monies paid out by her and with reference to the furniture and personal property acquired by both of said parties, it was, on or about September 38, 1944, agreed between said parties that each of them owned one half thereof and one half of the monies then in the bank, and the defendant, in pursuance of said agreement and settlement, wrote a check in the sum of $380.31 to plaintiff and gave the same to plaintiff, and that plaintiff cashed the same and received the money therefor from the First National Bank at Ilwaco, Washington, and he never did nor did he offer to return the same. That at the same time and place defendant wrote herself a check for the sum of $380.81, and she signed both of said checks as Mrs. Frances Hynes, and said checks and each of them were drawn upon the account of Jack Hynes in the said bank in Ilwaco, Washington."

Finding No. 11 is as follows:

"That at the time of said settlement, it was agreed between plaintiff and defendant that plaintiff would sell his undivided one half interest in said real property to the defendant for the sum of $2,000.00, but about two days afterwards he repudiated said offer to sell his undivided one-half interest, and thereupon he paid the taxes for the year 1944, and this is the only taxes he ever paid upon the real estate involved in this action. That since the time of said settle-

ment without the knowledge or consent of defendant and against the protests of the defendant and plaintiff has been collecting the rents from said real property in the sum of about $320.00, and one half thereof belongs to said defendant."

In finding No. 12, the court found that defendant is the owner in fee simple title of an undivided one-half interest in the lands in controversy.

Thereupon, the trial court entered judgment decreeing that the defendant is the owner in fee simple title to an undivided one-half interest in the real estate in controversy. The court further adjudged that the parties made a complete settlement as to all of their personal property and moneys involved in the action, and, pursuant to such settlement, defendant executed to plaintiff a check in the sum of $380.31, and that plaintiff cashed that check, received the money therefor, and he has never returned the same.

From this judgment, plaintiff has appealed and makes fourteen assignments of error. The first twelve involve the findings made by the court; the thirteenth is in regard to rendering judgment in favor of the respondent for an undivided one-half interest in the property, and the fourteenth is with respect to refusing to give appellant a lien for money advanced.

■ We have quoted appellant's testimony extensively for the reason that most of the findings are in accordance with his testimony. Also, we must bear in mind the rule that we are bound to accept the findings of the trial court unless, from the record, it appears that they are contrary to the clear preponderance of the evidence. See *Evans v. Hartmann*, 5 Wn. (2d) 434, 105 P. (2d) 717; *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 126 P. (2d) 584; *Gillarde v. Northern Pac. R. Co.*, ante p. 233, 179 P. (2d) 235.

The real estate involved was contracted for by appellant and respondent as purchasers. The down payment on the purchase price was made by appellant, and respondent furnished different articles of personal property and worked on and took care of the property. Both of the parties worked on and took care of the property, but, during a considerable

part of the time, respondent alone worked on the property and took care of it. The balance of the purchase price was paid out of the proceeds of the operation of the property and other contributions made by appellant. The deed to the property was made to appellant and to respondent. This much is not in dispute.

However, in addition, the trial court found that the parties entered into an agreement in Alaska to come down to the state of Washington and go into business together, and that, in pursuance of that agreement, they entered into a contract of purchase, under an agreement between themselves that whatever property they purchased *should be taken in the names of each of the parties and that each owned an undivided one half thereof*. This is borne out by the fact that the parties actually did come to Seattle shortly after they met in Alaska. Although respondent was a married woman, they immediately went down to Seaview and started to live together as husband and wife. They each held the other out to the community as husband and wife, and, shortly thereafter, a contract of purchase was entered into. This contract was apparently lost. Appellant testified that, soon thereafter, they refinanced the deal, and he and respondent signed a contract of purchase with Mr. DeMuth and wife for the same property.

At the time that appellant returned from Alaska, in September, 1944, he discussed a settlement with respondent. In answer to the question, "Did you agree to sell your interest or your half interest to her," he testified, "I agreed at that time, yes." Appellant further testified that he talked with Mr. DeMuth later about the value of the property, but claimed that he did not say anything to Mr. DeMuth about respondent's one-half interest. However, Mr. DeMuth was a disinterested witness, and he testified regarding this meeting as follows:

"Q. And where did you meet him? A. He came to where I was working and I,—building alongside the postoffice in Seaview. Q. In Seaview, Washington. And did you have a conversation with him? A. We did. Q. What did he say? A. He asked regarding the value of this property in ques-

tion. Q. The property in controversy? A. Yes. Q. And what else did he say? A. Well, he said he wanted to either buy or sell, buy the half interest or sell his half interest to Frances, or buy her half interest. Q. And what else did he say about the value, if anything? A. Well, he asked regarding the value and I told him if he could buy her half interest for two thousand dollars he wouldn't be hurt, something to that effect. Q. What else did he say, if anything? A. I don't remember anything special. He was there quite a while and we talked about various things. I don't recall anything except that I gave him what I considered was a fair value of the property. Q. How much was that? A. Four thousand dollars. Q. You are not interested in this matter? A. None whatever."

From the above, it is apparent that the trial court's findings are amply supported by the testimony. In fact, the weight of the evidence is in accordance with the trial court's findings instead of against them.

The rule of law in this state is that property acquired by a man and a woman not married but living together is not community property, but belongs to the one in whose name the title stands, in the absence of some trust relation. In discussing the right of heirs of a deceased person who had lived with another person as his spouse, in *In re Sloan's Estate,* 50 Wash. 86, 96 Pac. 684, 17 L. R. A. (N.S.) 960, we said:

"If there was no lawful marriage between the appellant and Mary Steves, as a matter of course there is and can be no community property. [Citing cases and authorities.]

". . . We do hold, however, that if it should appear that there was no lawful marriage between the appellant and the deceased, that the deceased was at all times fully aware of their meretricious relations, and that in view of such relations their property was kept separate and apart; the respondents have no right or interest in the property now in controversy."

In the case of *Engstrom v. Peterson,* 107 Wash. 523, 182 Pac. 623, respondent, as administratrix, brought suit to establish that her decedent, in her lifetime, acquired title to an undivided one-half interest in certain lands. The deceased had commenced living with appellant as his wife,

though in fact they were never married. Appellant purchased ten acres of land, for which he agreed to pay six hundred dollars, and, on the date of purchase, he received a receipt for two hundred dollars, paid in cash, as a part of the purchase price. He claimed that this was his individual savings. He later took his own funds and obtained a deed, naming himself as grantee. After delivery, this deed was altered so that the name of respondent's decedent appeared as one of the grantees. The trial court held that no alteration of a deed after it has once been delivered will have any effect. There was evidence that respondent's decedent and appellant occupied a house on the premises as husband and wife, and the claim was made by respondent that her decedent had put some of her own money into the property. Later a mortgage was placed upon the premises, signed by appellant and by respondent's decedent, as his wife. In discussing this case, we laid down the following as the rule of law covering such a situation:

"After a careful consideration of all of the testimony in the case, we find nothing which will remove the title to the property involved from the operation of the rule laid down in *Stans v. Baitey,* 9 Wash. 115, 37 Pac. 316, and *In re Sloan's Estate,* 50 Wash. 86, 96 Pac. 684, 17 L. R. A. (N. S.) 960, to the effect that property acquired by a man and woman not married, but living together as husband and wife, is not community property, and, in the absence of some trust relation, the land must be regarded as belonging to the one in whose name the legal title stands."

In discussing a somewhat similar situation in the case of *Carr v. Bell,* 129 Wash. 413, 225 Pac. 230, we stated as follows:

"Appellant insists that he was entitled to show that these respondents lived together and must have been presumed to have a community of interest; and cites *Engstrom v. Peterson,* 107 Wash. 523, 182 Pac. 623.

"The cited case does not sustain appellant. That case decided that property acquired by a man and woman not married but living together as husband and wife is not community property and, in the absence of any trust relation, belongs to the one in whom the legal title stands. Conceding that the property sought to be recovered in this

action was taken by either or both of respondents, under that decision it would not be constituted community property."

So far as the real estate is concerned, this case presents a situation where the title was taken in the names of both of the parties, even though the initial payment might have been made by appellant, and he later put some additional money in the business; there was no trust alleged or proved; respondent put some personal property into the venture; both of the parties operated the business, but respondent operated the property alone part of the time. The parties lived together as man and wife, and the trial court found that they agreed that the property they purchased "should be taken in the names of each of said parties, and they each owned an undivided one-half thereof." We believe, therefore, that the trial court correctly held that each of the parties owned a one-half interest in the real estate.

Since the trial court also found that the same agreement between the parties applied to the other personal property they purchased, a like conclusion follows. There had been a dispute between the parties as to the amount of money which should be on hand, appellant claiming that respondent had not accounted for all of the funds. The trial court found, and the finding is amply supported by the testimony, including that of the appellant, that the parties had agreed between themselves that they each owned one half thereof. Pursuant to that agreement, respondent wrote a check to the appellant in the sum of $380.31. She delivered that check to him, he cashed it, and kept the money.

In the case of *LeDoux v. Seattle North Pac. Shipbuilding Co.*, 114 Wash. 632, 195 Pac. 1006, we stated the rule in such a situation to be as follows:

"The general rule is that, where a debtor sends to his creditor a check for the amount he is willing to pay, and at that time informs the creditor that he intends the check to be considered as full payment, then, by the acceptance and cashing of the check, the creditor agrees to the settlement and cannot thereafter seek additional compensation."

In *James v. Riverside Lbr. Co.*, 121 Wash. 130, 208 Pac. 260, we stated:

"It is well settled that, where a claim is unliquidated or in dispute, payment and acceptance of a less sum than claimed when tendered in satisfaction operates as an accord and satisfaction. 1 C. J. 551."

In the case of *First Nat. Bank v. White-Dulaney Co.*, 123 Wash. 220, 212 Pac. 262, this court quoted the above-mentioned quotation from the case of *LeDoux v. Seattle North Pac. Shipbuilding Co., supra,* and then stated:

"This rule is not applicable where the debt or amount is liquidated or certain and due, unless there is a new consideration. 1 C. J. 539. But in this case, while the amount due on the receipts is definite and fixed, yet the fact that there was a claimed offset, which was disputed, renders the debt unliquidated."

In the case of *Sprague Ave. Inv. Co. v. Pacific Finance Corp.,* 5 Wn. (2d) 301, 105 P. (2d) 28, we stated as follows:

"Whether there has been an accord and satisfaction, is a mixed question of law and fact. *First Nat. Bank of Ritzville v. White-Dulaney Co.,* 123 Wash. 220, 212 Pac. 262. The rule of law by which the facts are to be measured in such cases as this is stated in *LeDoux v. Seattle North Pac. Shipbuilding Co.,* 114 Wash. 632, 195 Pac. 1006, as follows: . . ."

Then follows the above-quoted rule from *LeDoux v. Seattle North Pac. Shipbuilding Co., supra.*

It is apparent from appellant's own testimony that he and respondent settled their differences. She wrote him a check in full satisfaction of his interest in the moneys. He took the check, cashed it, and accepted the settlement. Therefore, he is bound by it.

The judgment is affirmed.

MALLERY, C. J., MILLARD, and ROBINSON, JJ., concur.

SIMPSON, J., concurs in the result.