Helene S. WOOD,
Appellant/Cross–Appellee,

v.

Vernon COLLINS,
Appellee/Cross–Appellant.

Nos. S–3208, S–3209 and S–3692.

Supreme Court of Alaska.

June 7, 1991.

952

Thomas L. Melaney, Anchorage, for appellant/cross-appellee.

Philip R. Volland, Anchorage, for appellee/cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal is centered on the superior court's division of the property of Vernon Collins and Helene Wood following the ter-

mination of their twelve-year intimate, yet non-matrimonial, relationship.

## I. FACTS AND PROCEEDINGS

Vernon Collins and Helene Wood are first cousins. In early 1974, when both were married, they became romantically involved with each other. Helene separated from her husband in September 1974 and divorced him in February 1975. In July 1975, Helene moved from Texas to Alaska, but then she returned to Texas in August. Vernon asked her to come back to Alaska. He told her that he would soon divorce his wife, and recommended that she sell her house in Texas. Helene sold the house, keeping all the proceeds, and returned to Alaska.[1] Thereafter, Vernon and Helene conducted themselves as husband and wife. When their romantic relationship ended in 1986, Vernon evicted Helene from the apartment over his shop in which she had been living. Upon eviction, Helene moved to a Hawaii condominium co-owned by Vernon and herself.

Helene and Vernon together had purchased the Hawaii condominium in March 1985 for $85,000. The condominium was the only property they acquired jointly. They had no joint bank accounts, nor did they comingle any of their accounts. The condominium deed recites that they took the property as tenants in common. Vernon contributed $1000, and Helene $4000, to the down payment. Vernon also borrowed $52,900 from the First National Bank of Anchorage to finance the purchase. After Vernon paid off the owner's equity, Vernon and Helene assumed the seller's loan jointly. Vernon has been making all the monthly payments on both notes. He has also paid all the monthly condominium fees, the property taxes, the telephone and electric costs, and property improvement costs.

In December 1986, Vernon brought suit against Helene for dissolution of the partnership in the condominium and for an accounting. Helene counterclaimed asserting that an express or implied agreement existed as a consequence of Vernon's prom-ise that he would take care of her housing needs for the rest of her life, in the event that their relationship terminated.

The superior court found that the parties owned the condominium as tenants in common. The court also concluded that it was the intent of the parties that Vernon pay the bulk of the upkeep, the mortgage, and other payments in connection with their ownership of the condominium. On the other hand, the superior court then awarded Vernon credit for half of the payments he made towards the "mortgage and taxes and condo fees, etc.," up to and after the point of the parties' separation. Finding that Vernon was excluded, for all intents and purposes, from occupying the condominium after the parties separated, the superior court also awarded him one-half the fair rental value of the property. As to Helene's counterclaim, the superior court found that no explicit or implicit contract was entered into by Vernon to provide Helene with housing. The court also found that the facts did not warrant an equitable remedy which would require Vernon to support Helene's housing needs.

The superior court's order allowed Helene to remain in the condominium until January 6, 1989. Beginning October 1, 1988, however, she was assessed one-half of the loan payments and condominium dues, plus payment of rent and utilities. The superior court further ordered the condominium sold, ordered Helene to comply with certain inspections and the sale, and directed entry of a judgment in Vernon's favor for $46,161.90.

Helene then filed a motion for reconsideration which was denied in all respects except that the superior court reduced Vernon's judgment from $46,161.90 to $41,186.32. The court also awarded Vernon attorney's fees as the prevailing party and awarded 12.5% prejudgment interest against Helene for rejecting a $20,000 offer of judgment.

On June 13, 1989, Helene filed a Motion to Enforce Order regarding the moving expenses Vernon was ordered to pay for Helene's goods. Helene had 180 days to

---

**1.** Helene received approximately $17,000 from the sale of the home.

inform Vernon where her goods should be sent, which she did. Helene never sorted through the material, however. Vernon stored her goods before the 180 days lapsed and assessed Helene the cost.

Vernon opposed the motion and submitted a Cross–Motion to Enforce and Modify Order and for Relief from Provisions of Order dated June 13, 1989, essentially seeking expenses he incurred as a result of Helene's noncompliance with the superior court's order, calling Helene's noncompliance "total." Thereafter, the superior court entered an order directing Helene to provide Vernon with access to the condominium, in order that Vernon could obtain a variance from the Honolulu Building Safety Department for the loft and bathroom, after which the property had to be listed and sold. Helene refused to cooperate "in every respect" with the necessary inspections and renovations. Consequently, Vernon had to travel to Hawaii to undertake the necessary renovations and arrange for inspections. She also refused to sign the listing agreement, pending the outcome of the appeal, and she refused to sell to one willing and able buyer. Helene vacated the condominium on January 20, 1989.

Thereafter, the superior court awarded Vernon, inter alia, expenses incurred for the moving, packing, and storage costs of Helene's possessions, Helene's unpaid rent and expenses, expenses in preparing the property for sale, and attorney's fees. The total judgement was $15,988.57.

## II. DISCUSSION

A. *Did the Superior Court Err in Failing to Find an Express or Implied Contract to Provide Helene with Housing?*

 Helene claims that Vernon promised to take care of her housing needs if they ever separated. Under a contract theory, she argues that she is entitled to relief. While Helene's appeal raises the question of whether an unmarried couple can contract for marriage-like benefits, we need not reach this issue.

The superior court found that no contract was made.[2] Over Vernon's denials, Helene claims that Vernon assured her that everything would be taken care of by him in the event they separated. The superior court did not find Helene credible. Alaska Rule of Civil Procedure 52(a) makes clear that issues of credibility are for the trial court. The court also found that there was no clear indication of what Vernon was agreeing to, if an agreement even existed.

Helene argues that the parties' conduct corroborates the existence of an agreement. Vernon accompanied her to look at alternative housing following a separation in 1982. Yet, the superior court called the significance of this act "speculation." Vernon never did buy her a condominium, nor was there a specific discussion as to her needs or his obligations. After their reconciliation in 1982, Vernon never represented to Helene that if they again separated, he would pay for her housing. While Vernon executed a will leaving Helene his Raspberry Road property, and amended his will to leave Helene an interest in the condominium, this only indicated Vernon's plans on death, not if they separated. The superior court found it significant that no writing existed as to the alleged agreement, when other important agreements between the parties, such as the agreement concerning the will, were reflected by writings. Also, Helene's letters, written after her eviction, never referred to an agreement. Finally, although Helene sold her home, Vernon denied urging her to sell it as a condition to

**2.** Under Civil Rule 52(a), these findings may be reversed only if clearly erroneous. *Horton v. Hansen,* 722 P.2d 211, 215 (Alaska 1986). Civil Rule 52(a) provides in part, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We must view the evidence in the light most favorable to the prevailing party at trial. *Horton,* 722 P.2d at 215. "[T]his court will only disturb trial court findings when we are convinced that they were clearly erroneous; that is, when we are left with a definite and firm conviction on the entire record that a mistake has been made...." *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979) (citations omitted).

beginning a relationship with him in Alaska; he asserts that he suggested she sell it because of tenant and rodent problems, about which Helene had complained. The trial court found "absolutely no indication ... that there was ... an exchange of a permanent guarantee of housing including the eventuality of separation."

Overall, we affirm the superior court's holding that there was no expressed or implied contract to provide Helene with housing for the rest of her life.

### B. Did the Superior Court Err in Denying Equitable Relief To Helene Which Would Have Required Vernon to Take Care of Helene's Housing Needs?

■ Helene claims that the superior court's denial of equitable relief, because it was not appropriate, was clearly erroneous. While this begs the preliminary question of whether equitable relief is available when a cohabitating couple ends its relationship and property questions arise, we need not address this question at this time. The superior court found that even if equitable principles applied, they favored Vernon, not Helene. This finding is not clearly erroneous.

The superior court found that Helene worked, kept all of her earnings, kept the investment from the sale of her house, had Vernon pay for out-of-pocket expenses when they travelled, and benefitted from Vernon's paying for her housing, food and entertainment. The court also found that Helene was not responsible for Vernon's net worth increase in any way. Helene was not actively involved with the operation of his business. While she did loan his company $110,000 for bonding, that money was paid back immediately. Vernon's accountant testified that Vernon's business increased in value primarily because of the economy and the addition of a new partner.

Vernon never used any of Helene's money. Helene worked as a travel agent until 1984 and kept all her own income from her work and her investments. By the time the parties separated, Helene had saved $200,000. Although Helene provided airline tickets for the couple to travel, she obtained those tickets free. This contribution alone is de minimis.

Helene points out that she divorced her husband, moved to Alaska, and sold her home in Texas. No indication exists, however, that she exchanged this for lifetime housing; rather, she did it because she wanted to be with Vernon. She admitted that her marriage had "disintegrated," and that she and her husband had discussed separation. While Helene divorced her husband and lost benefits associated with being an officer's wife, no evidence indicates that it was anything other than her emotional involvement with Vernon that spurred the divorce. She sold her house because she felt it was a burden. She kept the proceeds and invested them. Overall, the superior court's finding that the equities favored Vernon is not clearly erroneous.

### C. Did the Superior Court Err in Giving Vernon a Credit for Half of the Payments Made in Connection With the Condominium Prior to the Parties' Separation?

The superior court gave Vernon a credit for half of the payments he made towards the mortgage, taxes and condominium fees before the parties separated. The superior court relied on what was fair under the circumstances, the parties' intent, and the decision in Beal v. Beal, 282 Or. 115, 577 P.2d 507 (1978) (en banc).[3] While we agree with the superior court's interpretation of the law, we conclude that the superior court misapplied the law to these facts.[4]

3. Contrary to Vernon's claim, it appears that the superior court did rely on the decision in Beal for determining the parties' pre-separation obligations. The court said it was adopting Vernon's approach on remedies and referred to the cases his attorney discussed. Vernon's attorney had argued in closing, "[Beal] says up until the point of separation in the relationship, you deal with [the] tenants in common property on the basis of the intent of the parties."

4. Applying the law to a given set of facts is a question of law subject to de novo review. Foss

In *Beal*, the Supreme Court of Oregon found that property accumulated during cohabitation should be divided by determining the express or implied intent of the parties. *Id.* 577 P.2d at 510. There Barbara and Raymond Beal, recently divorced, purchased property together, listing themselves as husband and wife. Both contributed to the down payment, Barbara paying $500 more. Barbara made the first monthly payment; Raymond made all subsequent payments. The parties lived together in the house, both contributing to the household. After two years, Barbara moved out. Raymond remained and made all monthly payments on the house. The court decided the property dispute should be resolved by looking at the parties' intent. *Id.* at 510. Before Barbara moved out, the trial court found that the parties intended to pool their resources for their common benefit. *Id.* Therefore, both parties were held to have an undivided interest in the property. *Id.*

 The court rejected the regular rules of cotenancy, which would have required the parties to share expenses based on their ownership share, because these rules failed to account for the relationship between the parties. Instead, the court stated,

> We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon.
>
> . . . .
>
> In summary, we hold that courts, when dealing with the property disputes of a

man and a woman who have been living together in a nonmarital domestic relationship, should distribute the property based upon the express or implied intent of those parties.

*Id. See also Hynes v. Hynes*, 28 Wash.2d 660, 184 P.2d 68, 75 (1947) (cohabitating parties' agreement, that each shall own realty purchased in an undivided one-half interest, controlled property settlement). However, after Barbara moved out, the court applied the regular rules of cotenancy. *Id.* 577 P.2d at 511. We agree with *Beal*.[5] Property accumulated before separation should be divided by determining the express or implied intent of the parties.

In the case at bar, the superior court found,

> [I]t was the intent of the parties ... quite clearly that the property be ... owned jointly in equal shares. It was also the intent of the parties I think that the plaintiff was to pay the vast majority of the upkeep, the mortgage and other payments on the unit, as he has done. That was their pattern, and I don't think the mere fact that they took it as tenants in common really negated that pattern.

The history of Vernon paying for Helene's housing supports this conclusion. From 1975–1986, Vernon paid most of Helene's dwelling expenses. The fact that Helene never signed the First National Bank of Anchorage obligation which financed the purchase, nor was she asked to do so by Vernon, further supports this conclusion. Moreover, the parties were in a loving relationship. In essence, Vernon "volunteered" to make those payments prior to their separation; they were like a gift. *See Carlson v. Olson*, 256 N.W.2d 249 (Minn. 1977).

Vernon claims the record "fully supports" assessing one-half of the expenses against Helene. Vernon stresses that Helene said she would "eventually" share the expenses for the condominium. This vague

*Alaska Line, Inc. v. Northland Services,* 724 P.2d 523, 526 (Alaska 1986).

**5.** For questions of law, we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Landgon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987) (citations omitted). The standard of review is *de novo. Id.*

statement is too indefinite and unsubstantiated to indicate the parties' intent, especially when contrasted with their past pattern of financing their housing. Helene's "recollection of the events" leading up to the property's purchase, while "very similar to Bud's," also remains undefined. It does not demonstrate a mutual intent to share the expenses incurred while they were in the relationship.[6] Thus, we accept the superior court's finding that Vernon "was to pay the vast majority of the upkeep, the mortgage, and other payments." We also adopt the superior court's conclusion of law that, for unmarried cohabitants, the intent of the parties will control property division for property acquired before separation. However, we remand on this issue because the superior court erred when it applied the law to the facts, by ordering Helene to repay Vernon one-half of the payments he had made for Helene's housing prior to separation.

### D. Did the Superior Court Err in Awarding Vernon Attorney's Fees, Costs and Interest?

■ The superior court awarded Vernon $7,548.43 in attorney's fees pursuant to Civil Rule 82(a). Given Helene's success as to some of the issues on appeal, attorney's fees should be redetermined by the superior court on remand. *Dillingham Commercial Co. v. City of Dillingham*, 705 P.2d 410, 417 (Alaska 1985).[7]

6. Vernon believes the superior court's subsequent attempt at clarification of its order supports its final judgment. However, the clarification spoke mainly to the court's finding of law that the parties were tenants in common. Moreover, the clarification is ambiguous as to whether pre-separation expenses or post-separation expenses were made by Vernon as an "accommodation." Because the weight of the evidence comports with the court's initial finding that the pre-separation housing costs were paid by Vernon without expectation of recompense, we interpret the clarification in accordance with that finding.

7. Helene's other arguments concerning the award of attorney's fees lack merit.

8. Helene claims that the court erred in assessing prejudgment interest under Civil Rule 68 before the distribution of sale proceeds was calculated. Helene claims that the trial court must have

■ The superior court awarded prejudgment interest of $9,347.99.[8] Vernon claims that prejudgment interest should have been set at 15.5% as required by statute, and not 12.5%. He cites to the amended statute, *see* AS 09.30.065, as amended, which applies "to all causes of action accruing after June 11, 1986." Ch. 139, § 9, SLA 1986. As Vernon did not even evict Helene until July 16, 1986, the cause of action arose subsequent to June 11, 1986. Vernon did not file a cross-appeal on this issue; however, we find that misapplication of the statute constitutes plain error. Therefore, on remand, the superior court should apply the amended statute.

### E. Did the Superior Court Err in Not Awarding Vernon a Judgment for All Mortgage, Taxes, and Condominium Payments Following the Couple's Separation in September 1986?

The superior court found that Vernon was excluded "for all intents and purposes" from occupancy of the condominium after the couple separated. The superior court held, "from the time of separation, he is entitled to credit for ... half of the payments and ... one-half of the fair rental value of the property." The court based its decision on fairness and the holding in *Beal*.

concluded, possibly erroneously, that the distribution of sale proceeds would be less than Vernon's $20,000 offer of judgment. Vernon contends that his offer to pay Helene $20,000 was more favorable than the final judgment which was against her.

We do not address this argument. Helene's brief cites no cases for her position. Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal. *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980); *Fairview Dev., Inc. v. City of Fairbanks*, 475 P.2d 35, 36 (Alaska 1970), *cert. denied*, 402 U.S. 901, 91 S.Ct. 1374, 28 L.Ed.2d 642 (1971).

Helene also does not cite to the offer of judgment, nor does she explain how the superior court misconstrued the offer of judgment. Without explanation, we are unable to consider this argument and therefore consider it abandoned.

Vernon contends that *Beal* was misapplied. He believes that the rules of cotenancy and unjust enrichment dictate that when Helene had exclusive possession, he should have been awarded his full amount expended on the mortgage, taxes, and condominium payments. Helene responds by contending that traditional notions of cotenancy do not apply in the non-commercial situation and the parties' intent should govern.

 Contrary to both Vernon's and Helene's position, the superior court's ruling was correct. We hold that the rules of cotenancy apply after separation when the parties no longer were maintaining a domestic relationship. *See Beal*, 577 P.2d at 509–10. As the *Beal* court explained,

> Since the parties have not lived together since June, 1974, their property rights after that date should be determined by the regular rules of cotenancy. As such, Barbara is obligated to reimburse plaintiff for 50 percent of the house payments made by him after June 1974.

577 P.2d at 511 (citations omitted). Here, Vernon has made all the payments on the condominium from the time of separation. Hence, Helene must reimburse Vernon for her share of the post-separation payments.

 Under the general rules of cotenancy, a cotenant who occupies the premises need not pay rent to the nonoccupying cotenants.

> As a general rule, at common law a tenant in common who occupies all or more than his proportionate share of the common premises and who has not agreed to pay therefor or ousted or excluded his cotenant or cotenants is not liable to his cotenant or cotenants, because of such occupancy alone, for rent or for use and occupation.

86 C.J.S. *Tenancy in Common* § 46 (1954). However, as the *Beal* court explained, an exception to this rule exists when "one cotenant's use of the property in fact excludes the other cotenant's use and enjoyment of it." 577 P.2d at 511 (citations omitted). In *Beal*, the court noted that it would be impractical for the two parties to continue to occupy the premises. *Id.*

Here, the superior court made a finding that Vernon was excluded from the property from the time of separation. Vernon testified that, although Helene would let him visit if she was home, he was not able to use or occupy the condominium at any time since 1986. Additionally, he testified that he and his son were refused access when they were trying to have work done on the condominium. On this record, we cannot say that the court's finding was clearly erroneous. Given a finding of exclusive use and enjoyment by Helene, the trial court correctly applied the law of cotenancy and awarded Vernon one-half of the rental value for the post-separation period.

Vernon was properly awarded half the rental value, and half of the mortgage, tax, and condominium payments.

## F. Did the Superior Court Err in Not Awarding Vernon the Full Cost of Renovating the Condominium?

The superior court initially approved an order granting Vernon the full amount he requested for renovation and credit for his down payment. On reconsideration, the court apportioned to each party fifty percent of renovation costs and equalized the down payment between the parties.

Vernon first contends that Helene's motion for reconsideration was untimely. Helene moved for reconsideration on December 19, 1988. The order had been entered on November 10, 1988. Vernon contends Civil Rule 77(m) governs.[9] Helene argues that Civil Rule 60(a) or (b) applies.[10]

---

**9.** Civil Rule 77(m) states the following:

A motion to reconsider the ruling must be made within ten days after the date of notice of the ruling as defined in Civil Rule 58.1(c) unless good cause is shown why a later filing should be accepted. In no event shall a motion to reconsider a ruling be made more than ten days after the date of notice of the final judgment in the case.

**10.** Civil Rule 60(a) reads as follows:

Clerical mistakes in judgments ... arising from oversight or omission may be corrected by the court at any time of its own initiative

The court stated in its order that Helene's motion for reconsideration was "untimely." The superior court also stated, however, that it granted the motion because there was an issue it realized "might be plain error." Helene's motion, entitled "to reconsider, modify, and *correct* proposed judgment" (emphasis added) stated that "The Plaintiff's proposed final order does not accurately reflect the Court's oral findings and conclusions."

 The fact that the superior court may have called the motion one for reconsideration is irrelevant. *See Julsen v. Julsen*, 741 P.2d 642, 644 (Alaska 1987). We may affirm a decision on different grounds from those advanced by the trial court whether or not those grounds appear in the record. *Foster v. Foster*, 684 P.2d 869, 872 n. 6 (Alaska 1984). Even if we determine "that the decision of the superior court was incorrect as a matter of law, we may nevertheless uphold that decision if there is any other ground which, as a matter of law, would support the result reached by the superior court." *Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979). Here the superior court had jurisdiction to amend its judgment under Civil Rule 60(b)(6) for "a reasonable time." The motion was filed within six weeks of the order.

Vernon also contends that Helene waived any right to object because her counsel already approved a revised form of the order on December 16, 1988. However, although Helene's attorney did not initially catch the error, her motion to correct the proposed judgment was sufficiently timely under Civil Rule 60(b).

 Vernon also contends that the superior court's failure to award him the full amount of renovation expenses was inequitable. He essentially argues that the ouster prohibited him from enjoying the full value of the improvements; therefore, he should not be obligated to pay for half of the renovation expense. The right to reimbursement is an equitable right and recovery should be just and equitable under all the circumstances. *See In re Marriage of Berger*, 140 Ariz. 156, 680 P.2d 1217, 1225 (App.1983); *Hartog v. Siegler*, 615 S.W.2d 632 (Mo.App.1981). As both parties benefited from the expenditure upon the condominium's sale, Vernon should be obligated to pay for half of the expense.

G. *Did the Superior Court Err in Awarding Vernon $2,973.76 in Unpaid Rent?*

In a judgment dated October 27, 1989, the superior court awarded Vernon $2,973.76 for Helene's failure to pay the rent,[11] pursuant to the November 10, 1988 order, from October 1988 through January 1989. Section 1(c) of the November 10, 1988 order directed Helene to pay $733.95 per month in rent, plus utilities, beginning October 1, 1988, and continuing through January 1989.[12] Helene claims that while paragraph 1(c) required her to pay rent of $733.95 per month until she vacated, the parties stipulated to a fair market rental value for the condominium on December 7, 1988, of $775.00 per month.[13] Helene

---

or on the motion of any party and after such notice, if any, as the court orders....
Civil Rule 60(b) reads,
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise or excusable neglect;
....
(6) any other reason justifying relief from the operation of the judgment.
The motion shall be made within a reasonable time, and for reason[ ] (1) ... not more than one year after the date of notice of the judgment or orders as defined in Civil Rule 58.-1(c).

**11.** Unpaid rent from October through January totalled $2,935.80; unpaid utilities totalled $37.96.

**12.** Section 1(c) said, in part: "Beginning October 1, 1988, and continuing until plaintiff vacates the condominium, she shall pay one-half of all monthly loan payments and condominium dues, plus ... $733.95 per month in rent, plus utilities."

**13.** Section 2(g) states: "The sum of $9,687.50 (per stip/order 12/9/88), which represents one-half of the monthly fair rental value ($775.00) (per order 12/9/88) of the parties' condominium from October 1986 to the date of trial."

claims that the $733.95 figure was mistakenly not adjusted once the parties reached their stipulation. She argues that Vernon should therefore receive a rental credit of only $387.50 per month, and not $733.95.

We reject Helene's argument that the court's finding was clearly erroneous.[14] Paragraph 2(g) of the order, which was modified by the stipulation, was limited to pre-trial obligations and was unrelated to current rent. The stipulation itself states that it is an agreement as to fair rental value from October 1986 until December 1988. Moreover, as Vernon argues, the higher amount of rent post-trial reflects Vernon's anticipated rental income from the property. While Judge Katz does not mention two rental amounts, one pre-trial and one post-trial, the stipulation clearly considered two amounts, as did the order. Judge Fabe's refusal to adjust the post-trial rental figure after the parties stipulated a fair rental value was not an abuse of discretion.[15]

### H. Did the Superior Court Err in Awarding Vernon One–Half of the Condominium Expenses After Helene Vacated the Condominium?

Under Vernon's 60(b) motion, the superior court awarded him one-half of the mortgage and utility payments until the time of sale.[16] This modified the initial decision which would have ended Helene's contribution in January 1989, when she vacated the premises. The court found the original order assumed her cooperation with the sale of the condominium as ordered by the court. The court found this cooperation lacking. Helene claims she did not fail to cooperate, nor did she delay the condominium's sale.

The record amply supports the superior court's findings. Helene did not vacate the apartment by the court ordered date. She refused to cooperate with getting the condominium inspected and renovated for the variance. Vernon's son tried to gain entry for work associated with the variance, but Helene repeatedly refused to admit him. Vernon had to travel to Hawaii to undertake the necessary renovations. Helene refused to sign a listing agreement pending the appeal's outcome. She also refused to authorize the sale once a buyer was found. Overall, this aspect of the superior court's award was amply supported by the record.[17] The judgment is accordingly AFFIRMED in part, REVERSED in part, and REMANDED.

14. As we find the argument without merit, we do not address Vernon's argument that Helene's appeal on this issue was untimely or that Helene waived the right to appeal for failure to object to the inconsistency.

15. The standard for reviewing a denial of relief from judgment based on grounds of mistake, newly rediscovered evidence, fraud, equity, or for other reason is whether the trial court abused its discretion in denying the motion. See Nordin Constr. Co. v. City of Nome, 489 P.2d 455, 472 (Alaska 1971).

16. This amounted to an award of $5,524.83 to Vernon, representing one-half of the amount of monthly loan payments and condominium association dues from October 1, 1988, through June 1, 1989.

17. As to Helene's remaining arguments, relating to travel expenses and storage charges, we find them without merit.